No. 23-972
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

UNITED STATES OF AMERICA,

*Appellee,*

**v.**

SHEN ZHEN NEW WORLD I, LLC,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Central District of California
20-CR-326 (Hon. John F. Walter)
_____

**APPELLANT'S OPENING BRIEF**
_____

Richard M. Steingard
LAW OFFICES OF
RICHARD M. STEINGARD
724 Spring Street, 9th Floor
Los Angeles, CA 90014
Telephone: (213) 260-9449
rsteingard@steingardlaw.com

Yaakov M. Roth
Harry S. Graver
Alexis Zhang
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3939
yroth@jonesday.com

*Counsel for Defendant-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Defendant-Appellant Shen Zhen New World I, LLC, a California limited liability company, discloses that it is wholly owned, through a series of intermediaries, by Shenzhen New World Group, Co. Ltd., a non-public Chinese corporation.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT.................................................................i

INTRODUCTION .................................................................................1

JURISDICTIONAL STATEMENT ...........................................................3

STATEMENT OF THE ISSUES..............................................................4

STATEMENT OF THE CASE .................................................................4

    A.    Chairman Huang Buys the L.A. Grand Hotel..............................5

    B.    Chairman Huang Meets and Lavishes Councilman Huizar. ....................6

    C.    Chairman Huang Neither Requests Nor Receives Any Official Act From Councilman Huizar. ........................9

    D.    Councilman Huizar and Those Around Him Are Indicted. ...................12

    E.    SZNW Is Tried and Convicted of Bribery. ................................13

SUMMARY OF ARGUMENT.................................................................15

STANDARDS OF REVIEW .................................................................16

ARGUMENT .................................................................................17

I.    SZNW DID NOT COMMIT FEDERAL "BRIBERY." ...............................17

    A.    Federal Bribery Requires a *Quid Pro Quo* for Official Action...............17

    B.    The Government Did Not Prove a *Quid Pro Quo* for Official Action. .................................23

    C.    At Minimum, the Jury Instructions Failed To Distinguish *Quid Pro Quo* Bribery From Lawful Ingratiation. ..................28

    D.    These Errors Taint All of the Counts..........................31

II.    THE TRAVEL ACT CONVICTIONS INDEPENDENTLY FAIL. ..................35

III.    AT MINIMUM, SZNW IS ENTITLED TO A NEW TRIAL. ........................40

CONCLUSION ...............................................................................50

CERTIFICATE OF COMPLIANCE.......................................................51

CERTIFICATE OF SERVICE...............................................................52

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Beech Aircraft Corp. v. Rainey*,
    488 U.S. 153 (1988) ........................................................................ 47

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ..................................................................... 19, 20

*Chuman v. Wright*,
    76 F.3d 292 (9th Cir. 1996) ............................................................ 28

*Ciminelli v. United States*,
    598 U.S. 306 (2023) ........................................................................ 39

*Citizens United v. FEC*,
    558 U.S. 310 (2010) ........................................................................ 18

*Cleveland v. United States*,
    531 U.S. 12 (2000) .......................................................................... 39

*Commonwealth v. Albert*,
    29 NE.2d 817 (Mass. 1940) .......................................................... 37

*Evans v. United States*,
    504 U.S. 255 (1992) ................................................................. 18, 31

*FEC v. Cruz*,
    142 S. Ct. 1638 (2022) ...................................................... 21, 27, 29

*Kelly v. United States*,
    140 S. Ct. 1565 (2020) ................................................................... 39

*Kennedy v. Lockyer*,
    379 F.3d 1041 (9th Cir. 2004) ...................................................... 45

*McConnell v. FEC*,
    540 U.S. 93 (2003) .......................................................................... 18

*McCormick v. United States*,
    500 U.S. 257 (1991) ........................................................... 18, 21, 26

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*McCutcheon v. FEC,*
572 U.S. 185 (2014) ...............................................................................21

*McDonnell v. United States,*
579 U.S. 550 (2016) .........................................................................*passim*

*McNally v. United States,*
483 U.S. 350 (1987) ...............................................................................39

*Osborn v. State,*
28 S.W.2d 47 (Tenn. 1930)....................................................................37

*People v. Gaio,*
81 Cal. App. 4th 919 (2000) ........................................................... 35, 38

*People v. Kohut,*
282 N.E.2d 312 (N.Y. 1972)...................................................................37

*Percoco v. United States,*
143 S. Ct. 1130 (2023) ...............................................................28, 34, 39

*Perrin v. United States,*
444 U.S. 37 (1979) .................................................................................35

*Republic of Hawaii v. Young Hee,*
10 Haw. 114 (Haw. 1895).......................................................................37

*Sabri v. United States,*
541 U.S. 600 (2004) ...............................................................................32

*Salinas v. United States,*
522 U.S. 52 (1997) .................................................................................32

*Selvidge v. State,*
126 Tex. Crim. 489 (Tex. Crim. App. 1934)..........................................37

*Skilling v. United States,*
561 U.S. 358 (2010) ......................................................................... 17, 39

*State v. Davis,*
45 A. 394 (Del. 1899) .............................................................................37

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*State v. Durnam,*
   73 Minn. 150 (Minn. 1898)..............................................................37

*State v. Ferraro,*
   67 Ariz. 397 (Ariz. 1948) ................................................................37

*State v. Hart,*
   136 Wash. 278 (Wash. 1925)...........................................................37

*United States v. Abdelaziz,*
   68 F.4th 1 (1st Cir. 2023)........................................................ 48, 49

*United States v. Allen,*
   10 F.3d 405 (7th Cir. 1993) ............................................................26

*United States v. Bailleaux,*
   685 F.2d 1105 (9th Cir. 1982)........................................................44

*United States v. Biaggi,*
   674 F. Supp. 86 (E.D.N.Y. 1987)............................................. 36, 37

*United States v. Brewster,*
   408 U.S. 501 (1972) ........................................................................18

*United States v. Castro-Cabrera,*
   534 F. Supp. 2d 1156 (C.D. Cal. 2008) ..........................................47

*United States v. Charley,*
   1 F.4th 637 (9th Cir. 2021) ................................................44, 48, 49

*United States v. Chi,*
   936 F.3d 888 (9th Cir. 2019) ...............................35, 36, 38, 39

*United States v. Cross,*
   308 F.3d 308 (3d Cir. 2002) ...........................................................45

*United States v. Dimora,*
   750 F.3d 619 (6th Cir. 2014) ..........................................................19

*United States v. Fernandez,*
   722 F.3d 1 (1st Cir. 2013) ..................................................31, 32, 33

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Fuertes,*
805 F.3d 485 (4th Cir. 2015) ...........................................................44

*United States v. Garrido,*
713 F.3d 985 (9th Cir. 2013) ...........................................................33

*United States v. Hamilton,*
46 F.4th 389 (5th Cir. 2022) ..............................................31, 32, 33

*United States v. Holiday,*
998 F.3d 888 (9th Cir. 2021) ...........................................................44

*United States v. Huguez-Ibarra,*
954 F.2d 546 (9th Cir. 1992) ...........................................................47

*United States v. Jacobs,*
431 F.2d 754 (2d Cir. 1970) ......................................................29, 30

*United States v. Jennings,*
160 F.3d 1006 (4th Cir. 1998) .........................................................19

*United States v. Kemp,*
500 F.3d 257 (3d Cir. 2007) ............................................................19

*United States v. Kincaid-Chauncey,*
556 F.3d 923 (9th Cir. 2009) ...........................................................31

*United States v. Knapp,*
120 F.3d 928 (9th Cir. 1997) ...........................................................16

*United States v. Lindberg,*
39 F.4th 151 (4th Cir. 2022) ............................................................33

*United States v. Lopez-Medina,*
461 F.3d 724 (6th Cir. 2006) ...........................................................43

*United States v. Manarite,*
44 F.3d 1407 (9th Cir. 1995) ...........................................................16

*United States v. Marguet-Pillado,*
648 F.3d 1001 (9th Cir. 2011) .........................................................31

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*United States v. Martinez,*
  994 F.3d 1 (1st Cir. 2021) ................................................46

*United States v. Mayans,*
  17 F.3d 1174 (9th Cir. 1994) ...........................................45

*United States v. McCourt,*
  925 F.2d 1229 (9th Cir. 1991) .........................................43

*United States v. Quinones-Chavez,*
  641 F. App'x 722 (9th Cir. 2016) ....................................47

*United States v. Ring,*
  706 F.3d 460 (D.C. Cir. 2013) ........................................19

*United States v. Rodriguez,*
  880 F.3d 1151 (9th Cir. 2018) .........................................44

*United States v. Sawyer,*
  85 F.3d 713 (1st Cir. 1996) .............................................30

*United States v. Silver,*
  948 F.3d 538 (2d Cir. 2020) .......................................24, 26

*United States v. Snyder,*
  71 F.4th 555 (7th Cir. 2023) ...........................................33

*United States v. Stewart,*
  420 F.3d 1007 (9th Cir. 2005) ........................................16

*United States v. Sun-Diamond,*
  526 U.S. 398 (1999) .................................................*passim*

*United States v. Vizcarra-Martinez,*
  66 F.3d 1006 (9th Cir. 1995) .........................................45

*United States v. Wells,*
  879 F.3d 900 (9th Cir. 2018) ..........................................45

*United States v. Woodward,*
  149 F.3d 46 (1st Cir. 1998) ............................................19

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Wagner v. Cty. of Maricopa*,
    747 F.3d 1048 (9th Cir. 2013) ........................................................47

## STATUTES

18 U.S.C. § 201 ..............................................................................*passim*

18 U.S.C. § 666 ..............................................................................*passim*

18 U.S.C. § 1952 ......................................................................... 17, 35

18 U.S.C. § 1957 ......................................................................... 38, 39

28 U.S.C. § 1291 ................................................................................3

Cal. Penal Code § 67.5 ..................................................................35

Cal. Penal Code § 85 ....................................................................35

Cal. Penal Code § 165 ..................................................................35

## OTHER AUTHORITIES

Albert W. Alschuler, *Criminal Corruption: Why Broad Definitions of Bribery
    Make Things Worse*, 84 FORDHAM L. REV. 463 (2015) .............................. 20, 36, 37, 38

J.P. Bishop, Criminal Law (1923) .......................................................37

Black's Law Dictionary (4th ed. 1951) .................................................37

California Criminal Jury Instructions § 2600 (2021) ...........................................38

Fed. R. Evid. 403 .......................................................................... 45, 46

Fed. R. Evid. 404 ..........................................................................*passim*

Fed. R. Evid. 803 .........................................................................46

H.R. Rep. No. 99-797 (1986) ..........................................................32

Model Penal Code § 240.1
    (Am. L. Inst., Proposed Official Draft 1962)................................................36

R. Perkins, Criminal Law (1957) .......................................................37

S. Rep. No. 98-225 (1983) ...............................................................32

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

3 Wharton's Criminal Law (Anderson 1957) ....................................................37

Zephyr Teachout, CORRUPTION IN AMERICA (2014) .......................................19

## INTRODUCTION

In federal law, the essence of bribery is an *exchange*—a trade of something of value on one hand, for official action on the other. That fundamental trait is as old as bribery itself, evidenced by the familiar Latin phrase *quid pro quo*: this for that. Bribery thus requires a corrupt agreement, whether explicit or implicit, whereby each party will carry out his end of the bargain. That is what distinguishes a *bribe* from a *goodwill gift*. The latter is designed to cultivate a relationship with an official, but it is not given in exchange for any promise from him. Of course, it is likely (if not certain) the gift-giver anticipates wanting the official's help in the future; why else build goodwill? But such ingratiation is not corruption, and generalized influence is not official action. Steak dinners, box seats, complimentary travel—none of that is bribery unless the lobbyist, constituent, or donor provides it *in exchange for* a promise of official action.

This case is all *quid*—no *pro*; no *quo*. It involves plenty of ingratiation but, for all its tawdry tales, it is also barren of bribery. In 2013, a Chinese developer named Huang Wei (known as "the Chairman") began to lavish gifts on a Los Angeles councilman (Jose Huizar). A jury could readily have found that Huang, who had acquired a hotel in Huizar's district and was considering redeveloping it, wanted a friend in high places. But despite a flow of gifts to Huizar over a five-year period, it is undisputed that Huang never asked him to perform a single official act. Nor did Huizar ever *take* official action to advance any hotel redevelopment. Instead, Huang used Huizar as his Los Angeles consigliere—to arrange meetings, make calls, and supply recommendations.

Nonetheless, the Government charged Huang's company, Defendant-Appellant Shen Zhen New World I, LLC (SZNW), with a host of federal bribery offenses. Its theory was that Huang's gifts were bribes because Huang knew that Huizar was in a *position* to take official action to help SZNW in the future. As the prosecutors put it, Huang made an "investment" in Huizar; his plan was to "give, give, give," so that the wheels were sufficiently greased if he ever needed to make a "big ask." That narrative perfectly describes a goodwill gift—not a bribe. At most, the Chairman "invested" in the *hope* that Huizar would eventually be in the right place at the right time to help him, not pursuant to any *agreement* to that effect. He was "giving" to make Huizar *more receptive* to a "big ask" that could (but never did) follow, not *in exchange for* any "big ask."

Perhaps this course of conduct ran afoul of state and local ethics rules. But the Supreme Court has time and again (and again) rejected prosecutors' efforts to use the federal bribery laws to criminalize unseemliness in politics. And that is what is happening here (again), even if this wolf comes in a private jet. Stripped of the salacious and sensationalized facts, the Government's theory is that a jury can recharacterize any gift as a bribe if it finds that the gift-giver expected to want something from the official later. That is wrong. To prevent *every* gift to *every* official from becoming fodder for bribery charges, courts must scrupulously police the line between ingratiation and corruption. And under Supreme Court precedent, that line is clear: To be a bribe, a gift must *in that moment* form part of an *exchange* for *official action*. Whatever else might be said of the Chairman's conduct, there was no evidence of *that*.

2

The Government's failure to prove that Huang crossed the line from goodwill gifts to criminal bribes is the most fundamental legal problem with the convictions here, but it is not the only problem. The district court also failed to give adequate instruction on the difference between ingratiation and bribery, leaving the jury at sea as to colloquial versus actual corruption, and allowing the Government to conflate the two. That failure would warrant a new trial on all counts even if the evidence were legally sufficient. And the bribery counts resting on the Travel Act—one of the three federal statutes at issue—are independently defective, since they rest on predicate California offenses that are too sweeping to satisfy the Act's categorical approach.

Finally, all that aside, a new trial is required because significant evidentiary errors deprived SZNW of a fair trial. Because the Government had no evidence that Huang acted with corrupt intent, it filled the void by framing its case around how *Huizar* had engaged in series of *separate* pay-to-play schemes with *other* people Huang *knew nothing about*. That guilt-by-association play is one the Federal Rules of Evidence do not permit. Making matters worse, the trial court wrongly blocked countervailing evidence that the Chairman viewed his relationship with Huizar as benign. Those prejudicial errors, especially in combination, render the verdict unreliable.

One way or another, reversal is required on every count.

## JURISDICTIONAL STATEMENT

Final judgment was entered on May 12, 2023. 1-ER-2. SZNW noticed an appeal on May 18, 2023. 14-ER-3173. 28 U.S.C. § 1291 confers jurisdiction.

3

## STATEMENT OF THE ISSUES

**1.** Whether the Government proved that Chairman Huang's gifts were illicit bribes, even though he neither requested nor received any official action in return. And even if so, whether a new trial is nonetheless required because the district court failed to adequately instruct the jury on the difference between ingratiation and bribery.

**2.** Whether bribery under California state law amounts to generic "bribery" under the Travel Act, despite requiring neither a *quid pro quo* nor an official act.

**3.** Whether a new trial is required because the district court wrongly admitted significant evidence about bad acts Councilman Huizar took unbeknownst to SZNW, while also excluding evidence showing Chairman Huang's innocent intent.

## STATEMENT OF THE CASE

The central players in this case are Huang Wei (often called "the Chairman") and former Councilman Jose Huizar. Huang had bought a hotel in Los Angeles with the possibility of redeveloping it, and ultimately dreamed of adding to the property what would have been the tallest building west of the Mississippi. Huizar was the councilman for the hotel's district, and held great influence over the city's approval of real estate projects. The two were introduced and developed a friendship. Over five years, Huang provided Huizar with significant gifts and benefits—elaborate dinners, private flights to and from Las Vegas, casino chips for gambling, and more. But over the same period, it is *undisputed* that Huang never asked Huizar to take any official action to advance his potential project. And Huizar never did so.

4

Nonetheless, the Government charged SZNW with three sets of federal crimes, on the ground that the Chairman's gifts were really bribes all along.

## A.    Chairman Huang Buys the L.A. Grand Hotel.

Huang Wei grew up in the rice paddies of China, and worked his way to become a billionaire developer. 6-ER-1212. Once he was successful, delegations from the United States—including on behalf of Los Angeles County—flew to China to urge Huang and his organization to invest in this country. *See, e.g.*, 10-ER-2307-08. In 2010, Huang took up the invitation. He created SZNW, of which Huang is President and 100% owner, and bought the L.A. Grand Hotel in downtown Los Angeles for $63 million. 2-ER-304-05, -308, -314; 3-ER-557; 11-ER-2489.

When Chairman Huang purchased the L.A. Grand, the hotel was in bad shape. 4-ER-772. SZNW invested $25 million in a multi-year renovation (from 2010 to 2014) to overhaul the property. 3-ER-558. The renovation was a success and, as it drew to a close, Huang considered grander plans, including the possibility of transforming the 13-story hotel by adding a 77-story mixed-used skyscraper. 2-ER-317; 8-ER-1810.

It was no surprise that a massive redevelopment in the heart of downtown Los Angeles would take years and involve innumerable permits, approvals, and permissions from all parts of government. 4-ER-852-55; 5-ER-954. At the same time, as one of the prosecution's witnesses explained, this was a project that "sells itself." 5-ER-975. Redeveloping the L.A. Grand Hotel—and injecting millions of dollars into a depressed region of Los Angeles—was instantly and universally popular. 5-ER-924.

**B.     Chairman Huang Meets and Lavishes Councilman Huizar.**

In 2013, Raymond Chan—a member of the city's Department of Building and Safety, and a friend of Huang's—introduced Huang to Councilman Huizar at a dinner. 4-ER-736-37.  Also present were Ricky Zheng (Huang's right-hand man) and George Esparza (Huizar's aide), both of whom later testified at trial.  5-ER-998-1000.

Chan told Huang that Huizar was the mover-and-shaker for development projects in the city.  5-ER-1002-05.  Among other things, Huizar chaired the Planning and Land Use Management (PLUM) Committee, which oversaw all major development projects.  2-ER-289-90.  He was also the councilman for CD-14—the district where the L.A. Grand Hotel was located.  It was the norm for the Council to defer to the district councilmember's preferences as to a real estate project in his district.  4-ER-839-40. Chan thus explained that Huizar was the "big boss" of downtown, and "every project in the city of L.A. had to go through [his] desk."  5-ER-1002-05.  Huang replied in broken English: "Very, very good."  5-ER-1003.

The dinner was emblematic of many Huang-Huizar interactions to come: It involved "rolling" food, "very expensive wine," and luxury gifts. 5-ER-1000.  Ray Chan and a SZNW employee (Harris Chan; no relation) translated between the two principals, given that Huang barely spoke English.  5-ER-1000-02.  Despite their communication challenges, a true friendship developed among Huang, Huizar, Zheng, and Esparza. *See e.g.*, 6-ER-1218-20.

6

Over the course of the roughly five years that followed, Huang lavished Huizar with gifts. Most notably, Huang took Huizar to Las Vegas almost 20 times. 3-ER-400. For context, the Chairman was no stranger to Las Vegas, even before SZNW existed, and had gone dozens of times since 2006. 3-ER-514. And when there, the Chairman gambled prolifically, to the tune of millions of dollars each visit. 10-ER-2238-39. Because of his high-rolling, the casinos were quick to "comp" Huang's trips, to incentivize him to pull up his chair to their tables. Indeed, the lion's share of his Las Vegas trips—except the gambling—was free, from the private jets to and from Nevada, to palatial hotel suites, to all-expense-paid spa treatments, to tee times, to fancy dinners, and more. 8-ER-1768-71. And that was true not only for Huang personally, but also for the crew that regularly accompanied him: The casinos treated Huang's friends like him, with all of the free perks afforded to high-end rollers. 6-ER-1212.

Soon after their dinner in 2013, Huang added Huizar to his regular group of Las Vegas travel companions. 5-ER-1008. He did not bring Huizar along every time he went (less than half the time, actually); but when he did, Huizar was treated as the guest of honor. 10-ER-2229; 5-ER-1023. And Huizar was eager to receive an invitation— always willing to head to Las Vegas at a moment's notice, and more than willing to avail himself of the casinos' comps: private jet flights, room service, wine, spa trips, dinners, etc. *See, e.g.*, 5-ER-1031-41; *see also* 5-ER-1034 (Esparza explaining how Huizar would order wine to room and stash in duffel bag). The Government's case-in-chief at trial was decorated with these luxury perks (with photos documenting the opulence).

7

Another benefit to accompanying the Chairman to Las Vegas was that while Huang loved to gamble, he did not love to gamble alone. He thus regularly gave chips to friends around him—up to $25,000 at a time—so they could play alongside him. *See* 8-ER-1860; 9-ER-1909; 5-ER-1038. When Huizar traveled with Huang, he received chips too—almost always as much as anyone, if not more. 5-ER-1021-22; 8-ER-1778. Huizar developed his own routine, gambling with some of the chips that Huang gave him while pocketing the balance to be cashed-out later and taken home. *See, e.g.*, 5-ER-1068. Over the span of about five years, the Government estimated that Huizar received roughly $260,000 from these Las Vegas trips. 10-ER-2203.

There were some more unsavory aspects of the trips, too. It was not uncommon for Huang's group to end evenings by patronizing prostitutes. And those services were paid for by Huang, not comped by the casinos. 5-ER-1017-18.

Perhaps in light of all this, Huizar tried to ensure his trips to Vegas would stay in Vegas, and for his lavish escapades with a Chinese national to stay private. For instance, Huizar often used a fake name on flight manifests. *See, e.g.*, 5-ER-1053. He had Esparza (his right-hand man) cash out chips for him, and do so in inconspicuous amounts. *See, e.g.*, 5-ER-1068-69. And at one point, when a casino recognized him as a politician, he refused to sign a form attesting that he was not gambling with public funds—instead, he chose to leave the casino floor. 5-ER-1048-49. Huang knew of some of Huizar's efforts at discretion, and did what he could to oblige Huizar's efforts to keep a low profile. 5-ER-1050; 8-ER-1787-89, -1794-95.

8

Las Vegas trips were not the only benefits that Huang bestowed on Huizar. The councilman joined Huang (and Huang's friends) on other all-expense-paid trips, such as a gambling junket to Australia and a golf outing to Pebble Beach. *See, e.g.*, 5-ER-1139-46. Huang also helped Huizar secure a bank loan to help Huizar settle a sexual harassment suit that threatened his career. 3-ER-416-18; 5-ER-1072. At the end of 2014, after Huizar and Huang had become close, Huizar asked the Chairman to put up collateral for the loan. 4-ER-740-49. Huang agreed, in the amount of $600,000. 3-ER-453. Huang originally wanted to just give Huizar the money—wholly out in the open. 6-ER-1267. But Huizar wanted to keep Huang's largesse quiet. Huang's aides thus created a convoluted corporate structure, operated by straw figures pursuant to documents and promissory notes drafted by a once-disbarred attorney, to obscure the connection. *See, e.g.*, 6-ER-1266-70, -1409-14; 9-ER-1919-22; 10-ER-2119. The loan was secured; the suit was settled; and Huizar won reelection in 2015.

Over the course of their half-decade relationship, it is undisputed that Huang provided Huizar with hundreds of thousands of dollars' worth of gifts, travel, and other benefits (including those "comped" by the casinos). *See, e.g.*, 10-ER-2205.

## C. Chairman Huang Neither Requests Nor Receives Any Official Act From Councilman Huizar.

Huang's gifts earned him access to Huizar and his office; when the Chairman called, Huizar answered. 5-ER-1100-07. But over their half-decade together, Huang never asked Huizar to take any official action on his behalf. That is *undisputed*.

9

Rather, Huang relied on Huizar as, in effect, his Los Angeles consigliere. For example, he asked Huizar to arrange meetings for him: one to deal with a parking lot dispute involving the L.A. Grand, and another to smooth over a dispute with a local union. 4-ER-765 (asking Huizar "to open the door so the two sides can sit down and talk"), -761-62 (helping negotiate labor resolution). He made other similar requests: for advice on consultants (3-ER-564-65) and press relations (5-ER-1136); recommendation letters to help facilitate various matters, like a friend's visa or foreign financing (4-ER-750-58, 5-ER-1129-33); and help getting the Chairman's son get into college (5-ER-1099). The Government (rightly) did not claim *any of this* was "official action."

For his part, in April 2014, Huizar offered a non-binding, commendatory city resolution honoring Huang's economic contributions to the city—something Huang never asked for (or even knew about), and something Esparza said Huizar would often do to show off for "friends of the office." *See, e.g.*, 6-ER-1253.

At Huang's behest, Huizar's office also organized a meeting with city officials and Huang's team in August 2016 to discuss possible redevelopment of the L.A. Grand. Along with the deputy mayor, Huizar led talks on the potential project. 4-ER-867-73; 11-ER-2458-60. Although one city official testified that this meeting was unusual, there were no votes, approvals, or official actions taken at it, and the Government does not contend that the meeting itself counted as an official act either. *See* 11-ER-2584-85. Thereafter, Huizar did not do anything meaningful as to the L.A. Grand or potential redevelopment for the rest of his term in office. *See, e.g.*, 6-ER-1320-21.

Nor did the Chairman ever ask him to. To be sure, the Chairman made known that he wanted his redevelopment project to succeed. Huizar understood Huang as wanting the L.A. Grand to be his "big dick" over Los Angeles. 5-ER-1113-14. And Huizar (along with everyone else) told the Chairman he was broadly supportive of the multi-million-dollar investment into a depressed part of his district. 5-ER-1112-15. But it is undisputed that Huang never asked Huizar to take any official act to advance the project. Even the lead FBI agent testified that it was "unclear" whether Huizar had ever done *anything* meaningful for SZNW. 3-ER-617-22; *see also, e.g.*, 9-ER-1943 (Ricky Zheng admitting same on cross-examination).

Indeed, given his term limits, it was unlikely that Huizar *ever* would have been in a position to help SZNW advance the project. As noted, the Chairman did not start discussing the redevelopment until May 2015 (3-ER-460), after Huizar had been reelected for a third full term—the most he could serve. SZNW ordered a study in 2017 to explore a sense of profits if the hotel opened in 2021 (7-ER-1670), but did not even submit its initial redevelopment application until June 2018 (7-ER-1589). It was thus obvious for years that the project would not reach PLUM, to say nothing of *being done*, until well after 2020—the year Huizar was required to leave office due to term limits. *See, e.g.*, 5-ER-953-58; 7-ER-1579, -1631-32, -1648; 3-ER-601-03.[1]

---

[1] Huizar initially planned (and Huang supported) to have his wife run for his seat on the Council. But she testified she had neither heard of nor was part of any plan to support the L.A. Grand redevelopment, should she even be elected. 9-ER-2055.

### D. Councilman Huizar and Those Around Him Are Indicted.

Term limits, though, were not why Councilman Huizar ultimately left office. Unbeknownst to Huang, Huizar was at the center of a series of pay-to-play schemes involving other developers. And those schemes were not characterized by subtlety. When Huizar wanted a bribe, he made no secret about it. He had Esparza make clear that Huizar would not do things "for free," and the two were not shy about setting their price. 13-ER-3063. For instance, with one developer, Huizar allegedly quoted his support for voting on a matter at $1.2 million, and then had Esparza *negotiate the bribe amount* before taking any action. 13-ER-3064-65. These were not winks-and-nods; Huizar was in the business of selling specific action. *See, e.g.*, 13-ER-3104 (Huizar saying he would "vote against the labor union" only if company would "make it worthwhile" with $50,000 contribution); 13-ER-3074-75, 3077 (having company pay fake $11,000 monthly retainer in exchange for Huizar taking specific actions in PLUM Committee); 13-ER-3111 (agreeing to offer resolution in exchange for $25,000).

These efforts eventually gained the attention of law enforcement. Huang caught wind in May 2017 that the FBI was investigating Huizar, though he did not know for what. 6-ER-1188. Regardless, Huang decided to stop inviting Huizar to Las Vegas, and tried to recover the collateral on the loan he had backed. 8-ER-1824-25. (Huang was unsuccessful as to the latter. 9-ER-2082; 10-ER-2212.) But Huang pressed forward with the redevelopment; he saw no reason why Huizar's possible legal troubles would affect the L.A. Grand. 8-ER-1838.

12

In November 2018, the FBI raided Huizar's house and City Hall office. 3-ER-494-95. Two days later, agents went to talk to Huang about Huizar. 3-ER-503. About a week later, they raided Zheng's home. 3-ER-504. At that point, no charges had been filed, but Zheng told Huang about the raid. 8-ER-1827. The Chairman soon left the country and returned to his home in China, where he has remained. 8-ER-1827-28.

In November 2020, the Government filed a sprawling superseding indictment against Huizar and others. 13-ER-3033. Huang and SZNW were charged with honest-services fraud, federal-programs bribery, and violating the Travel Act.

### E.    SZNW Is Tried and Convicted of Bribery.

The Government first sought to try everyone together, but the district court held that it failed to proffer evidence showing Huizar's pay-to-play operation was a single scheme, creating a risk of prejudicial spillover that warranted severance. 12-ER-2886-89. As for SZNW, the court later observed it was "quite different" from the other matters shoehorned into the indictment, and was "the most difficult" because it lacked an "obvious" official act or identifiable exchange. 12-ER-2728-30, -2734-35.

With Huang (now labeled a fugitive) in China, SZNW was tried alone. The facts about Huang's behavior were largely undisputed: The Chairman gave Huizar significant benefits over five years, including while the L.A. Grand redevelopment project was a possible future matter before the City Council. According to the Government, this was all part of a corrupt "investment" by Huang. *See, e.g.*, 6-ER-1380-81. His plan was to "give, give, give until he could make the big ask." *See, e.g.*, 6-ER-1377-78.

Even the Government conceded, however, that Huang never made *any* ask (big or small) for official action. *See, e.g.*, 11-ER-2590 ("There didn't have to be the big ask. Their entire relationship was the big ask."). Nor did Huizar do *anything* meaningful to advance the redevelopment. 11-ER-2514 (emphasizing things Huizar "could" have done, but did not); *see also, e.g.*, 11-ER-2426 (Director of City Planning testifying that Huizar did not pressure him a single time about the L.A. Grand redevelopment).

Lacking any evidence of corrupt intent on the part of the Chairman or SZNW, the Government focused on Councilman Huizar. Over objection, the court allowed the prosecution to introduce evidence—in fact, frame its case around—*Huizar's* pay-to-play schemes with other real estate developers (which Huang did not know about). *See, e.g.*, 5-ER-986-92. The Government also called *three* of *Huizar's* family members to talk about how he used them to launder money, not only from the gambling chips but also bribes from other developers (another thing Huang did not know). *See, e.g.*, 8-ER-1724-40; 9-ER-1967-78, -2001-09. And the Government relied heavily on how *Huizar* tried to conceal his relationship with Huang. *See, e.g.*, 9-ER-2062-75.

SZNW's defense was that the Chairman's gifts were attempts at ingratiation, at most; he was trying to build a reservoir of goodwill. But that defense was virtually dead on arrival, since the jury was told again and again how Huizar was running pay-to-play schemes with other developers. Compounding the prejudice, the trial court excluded exculpatory evidence of Huang's state of mind and refused to instruct the jury on the difference between goodwill gifts and bribery. *E.g.*, 1-ER-8-14, -48-51, -171-72.

14

The jury convicted SZNW on all charges: three counts of honest-services fraud (Counts 2, 3, and 4); one count of federal-programs bribery (Count 23); and four Travel Act counts (Counts 18, 19, 20, 21). 1-ER-15-27. The jury identified the "official acts" it believed SZNW intended to receive for Huang's gifts. All were generic acts Huizar was empowered to take as part of his position, and the only one he *actually* took was the ceremonial resolution. 1-ER-16-22. The court denied post-trial relief. 12-ER-2653.

## SUMMARY OF ARGUMENT

**I.**    The Supreme Court has repeatedly held that the essence of bribery is an exchange. Bribery is when benefits are provided in return for official action, whereas ingratiation is when benefits are provided with the goal of cultivating general goodwill to use later. The former is a crime; the latter is lobbying.

The Government offered no evidence that Chairman Huang crossed the line from ingratiation to bribery: It conceded that he never asked Huizar to perform a single official act; it never offered any indication Huang thought he was part of a *quid pro quo*; nor could it identify anything meaningful Huizar did to further the redevelopment—a project that was universally popular. Instead, the Government's strategy was to conflate ingratiation and bribery—and in turn, extend the federal bribery laws over much of American politics. Its case reduced to this: Why give the gifts if *not* for something in return? But that could be said of virtually *every* gift to *every* politician. The federal bribery laws require more. At minimum, a new trial is needed, because the court failed to give the jury adequate guidance on the difference between ingratiation and bribery.

15

**II.** The Travel Act charges independently fail as a matter of law. California's bribery laws—which do not require a *quid pro quo*, to say nothing of an official act—are far broader than the generic definition of bribery at the time the Travel Act was enacted, and thus cannot serve as predicate offenses under its categorical approach.

**III.** At minimum, SZNW is entitled to a new trial. The prosecution framed its case *not* around SZNW's conduct with Huizar, but around Huizar's *own* conduct and his conduct with *others*. The prosecution was allowed to adduce significant evidence about how Huizar was at the center of pay-to-play schemes involving other developers: something Huang did not know about, and had no involvement in. Nonetheless, this tack allowed the Government to brand the Chairman as just another corrupt developer, and vitiated SZNW's defense that Huang's gifts were only attempts at ingratiation. This was classic guilt by association. SZNW deserves a trial in which the jury ascertains its guilt or innocence based on its own conduct, not that of others.

## STANDARDS OF REVIEW

This Court reviews *de novo* whether sufficient evidence supports a conviction. *United States v. Stewart*, 420 F.3d 1007, 1014 (9th Cir. 2005). This Court also reviews *de novo* whether jury instructions accurately state the elements of the offense; it otherwise reviews instructional rulings for abuse of discretion. *United States v. Knapp*, 120 F.3d 928, 930 (9th Cir. 1997). Likewise, the Court reviews *de novo* whether evidence falls within Federal Rule of Evidence 404(b), but otherwise reviews evidentiary rulings for abuse of discretion. *United States v. Manarite*, 44 F.3d 1407, 1418 (9th Cir. 1995).

# ARGUMENT

## I.  SZNW DID NOT COMMIT FEDERAL "BRIBERY."

SZNW was convicted under three federal statutes, all of which prohibit bribery. *See Skilling v. United States*, 561 U.S. 358 (2010) (interpreting honest-services fraud statute to prohibit bribery); 18 U.S.C. § 666 ("Theft or bribery concerning programs receiving Federal funds"); *id.* § 1952 (prohibiting travel in interstate or foreign commerce with intent to commit certain predicate acts, including "bribery").  Under federal law, the core feature of bribery is a *quid pro quo*: giving a benefit *in exchange for* official action.  But the Government failed to prove that definitional element.  Huang's half-decade of gifts bore every hallmark of ingratiation—even on the Government's account, they were an "investment" designed to grease the way for a future "big ask."  Sustaining a bribery verdict on this record—with *no request* for official action, *no provision* of official action, and *no evidence* indicative of an agreement—would vastly extend the federal bribery laws into the realm of ordinary politics, contrary to the Supreme Court's repeated guidance. At minimum, SZNW deserves a new trial with jury instructions that differentiate lawful ingratiation from actionable corruption.

### A.  Federal Bribery Requires a *Quid Pro Quo* for Official Action.

Bribery is an illicit bargain—an exchange where a benefit is traded for an official action, on understood terms.  Gifts to curry political favor, by contrast, amount to mere ingratiation, despite the giver's hope to reap some benefit down the line.  *Quids* are the daily bread of politics; it is the *pro quo* that transforms them into a federal crime.

17

1.    The Supreme Court has been very clear about the definition of a bribe: It is something of value given "in return for" an official's agreement "to perform specific official acts." *Evans v. United States*, 504 U.S. 255, 268 (1992). Federal bribery law thus "prohibits *quid pro quo* corruption—the exchange of a thing of value for an 'official act.'" *McDonnell v. United States*, 579 U.S. 550, 574 (2016). When an official takes a bribe, his actions are "controlled by the terms of [a] promise or undertaking" that is defined with "sufficient clarity." *McCormick v. United States*, 500 U.S. 257, 273 (1991); *see also, e.g.*, *United States v. Brewster*, 408 U.S. 501, 526 (1972) ("The illegal conduct is taking or agreeing to take money for a promise to act in a certain way.").

And the Court has been equally clear about what bribery is *not*. "Ingratiation and access," in particular, "are not corruption." *Citizens United v. FEC*, 558 U.S. 310, 360 (2010). It is thus not bribery for citizens to shower elected officials with gifts to "build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future." *United States v. Sun-Diamond*, 526 U.S. 398, 405 (1999). In fact, that is a mainstay of modern politics. In *McConnell v. FEC*, for instance, the Court described how "national party committees actually furnish[ed] their own menus of opportunities for access," where "increased prices reflect[ed] an increased level of access" to legislators. 540 U.S. 93, 151 (2003). It even highlighted an example of "courtesies extended" to an individual whose donations were "motivated by his interest in gaining the Federal Government's support for an oil-line project." *Id.* at 130. That was viewed as a matter for *campaign finance regulation*, not *criminal prosecution*.

Supreme Court jurisprudence thus creates a dichotomy between bribery on the one hand, and "goodwill gifts" made only "with a generalized desire to influence" on the other. *United States v. Jennings*, 160 F.3d 1006, 1020-21 (4th Cir. 1998). Under this framework, plying a public official with "free meals, entertainment, and golf" (or trips to Vegas) is distinct from "*quid pro quo* bribery." *United States v. Woodward*, 149 F.3d 46, 55 (1st Cir. 1998). "The line between legal lobbying and criminal conduct is crossed" by "a corrupt exchange—i.e., a quid pro quo." *United States v. Ring*, 706 F.3d 460, 464 (D.C. Cir. 2013); *see also United States v. Kemp*, 500 F.3d 257, 281 (3d Cir. 2007) (noting "critical difference between bribery and generalized gifts provided in an attempt to build goodwill"); *United States v. Dimora*, 750 F.3d 619, 625 (6th Cir. 2014) (similar).

Importantly, the patron's hope that goodwill may translate into favorable action in the future does not make his gift a bribe. After all, a lobbyist who regularly treats politicians to steak dinners with nothing to show for it will soon be out of a job. And a donor who lets the Governor use his beach house is not doing it for the Airbnb rating. Rather, the critical distinction—what differentiates *buttering up* from *buying*—is whether the parties have entered an *exchange* for official action. Only then does ingratiation cross the line to corruption. *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 28 (1976) (federal bribery law proscribes "specific attempts" to control particular "governmental action"). Even commentators critical of this line have accepted it as the law. *See, e.g.*, Zephyr Teachout, CORRUPTION IN AMERICA 7 (2014) (federal bribery law extends only to "exchange of something of value for a specific, identifiable legislative or executive act").

19

**2.** The line between *quid pro quo* corruption and general influence is easy for courts to articulate, but can also be (too) easy for prosecutors to circumvent. After all, a public official "*always* has before him or in prospect matters that affect" interested parties. *Sun-Diamond*, 526 U.S. at 407. It is therefore *always* possible to hypothesize acts the politician could take to benefit the gift-giver, either now or in the future. And as a result, it is *always* possible for a prosecutor, especially on a long enough time horizon, to link the two as part of some unspoken exchange. It takes no imagination to see how a jury jaundiced by today's politics could look at the coziness of politicians and their donors, and brand its ordinary give-and-take as corruption.

That is a problem. Due process and fair notice require a clear understanding of "the permissible scope of interactions between state officials and their constituents." *McDonnell*, 579 U.S. at 576. Without it, only "the Government's discretion" shields ordinary politics from prosecution. *Sun-Diamond*, 526 U.S. at 408. That, in turn, casts a "pall" that chills representative government, *McDonnell*, 579 U.S. at 575—a chill that is all the more concerning since many political *quids* (namely, campaign donations) are protected by the First Amendment. *Buckley*, 424 U.S. at 54. Not to mention practical reality: "If an official were subject to imprisonment whenever a jury could be persuaded that he had acted deliberately to benefit someone who once did a favor for him, only a fool would take the job." Albert W. Alschuler, *Criminal Corruption: Why Broad Definitions of Bribery Make Things Worse*, 84 FORDHAM L. REV. 463, 481 (2015).

Those serious constitutional and practical concerns make it critical that "the line between *quid pro quo* corruption and general influence … be respected." *McCutcheon v. FEC*, 572 U.S. 185, 209 (2014). The objective is to meaningfully "distinguish between" actions "traceable to legitimate donor influence or access," and those that are "part of an illicit *quid pro quo*." *FEC v. Cruz*, 142 S. Ct. 1638, 1654 (2022). And to accomplish that objective—that is, to create an enforceable distinction between true bribery and the mere "giving of gifts by reason of the recipient's mere tenure in office" (*i.e.*, lawful ingratiation)—the Court has insisted that bribery's *quid pro quo* requirement have real teeth. *Sun-Diamond*, 526 U.S. at 408. Those teeth include the following:

*First*, something is a bribe (or not) "at the time" the gift is given. *McDonnell*, 579 U.S. at 572. A gift cannot *become* a bribe retrospectively, nor can the Government recast it as such. *McCormick*, 500 U.S. at 283 (Stevens, J., dissenting) ("When petitioner took the money, he was either guilty or not guilty."). Rather, a gift is a bribe only if there is a specific exchange at the moment it changes hands; otherwise, it is ingratiation—filling a "reservoir of goodwill" to be tapped later. *Sun-Diamond*, 526 U.S. at 405.

*Second*, when a *quid* passes hands, the terms of the bargain must be sufficiently defined. Bribery does not capture amorphous arrangements where an official's side of the deal is too remote to specify; the *quo* cannot be filled in later, or remain so capacious as to be a placeholder. *Id.* at 406. Federal "bribery" requires instead a clear "connection" between a person's gift, on one side of the ledger, and a "specific official act," on the other. *Id.* at 405; *see also McDonnell*, 579 U.S. at 574.

21

*Third*, the bribe must be exchanged for *official action*. The bribery laws do not extend to "nearly anything a public official does"; not everything is a *quo*. *McDonnell*, 579 U.S. at 575. Rather, in *McDonnell*, the Court clarified that official action means "a formal exercise of governmental power" on a "focused and concrete" matter that falls "within the specific duties of an official's position." *Id.* at 570-71. It cannot be defined at a "higher level of generality," to include action on "a broad policy issue," or to sweep in "a typical meeting, telephone call, or event." *Id.* at 570, 567-68. Given that "relatively circumscribed" definition, *id.* at 570, the Government cannot prove bribery by showing an "exchange" of gifts for routine political courtesies or "support"—the agreement must link to a specific and concrete exercise of sovereign power.

These doctrinal glosses on the *pro* and *quo* elements help prevent goodwill gifts from being recharacterized by juries as illicit bribes. An exchange cannot be inferred merely from chronology viewed in retrospect, or merely because the gift-giver has some project on the horizon, or merely because the official's generic powers could prove useful, or merely because the official provides access or non-official support. None of that establishes that, *at the time* of the gift, the parties had reached a genuine *agreement* that embraced *official action*. None of it differentiates archetypal examples of lobbying, such as when a defense contractor hosts members of the Armed Services Committee at a cocktail party, knowing full well its profits will depend on the annual National Defense Authorization Act. Again, even *purposeful* ingratiation is fundamentally different from an exchange for official action, and only the latter is bribery.

*McDonnell* is a perfect illustration. There, a donor plied the Governor with tens of thousands of dollars in gifts and benefits (*e.g.*, rides on his private jet, multiple loans, fancy dinners). He did so while seeking state support for his company's nutritional supplement. But he never requested—or received—any "official act" in return, only those services politicians do for constituents "all the time," like "arrang[ing] meetings" or "contact[ing] other[s] … on their behalf." 579 U.S. at 575. The Court unanimously vacated the bribery convictions. It reaffirmed that federal bribery reaches only "*quid pro quo* corruption." *Id.* at 574. It therefore did not matter that the Governor *could* have done things to help his benefactor (*e.g.*, sign bills, issue vetoes, or order studies). If that sufficed, every gift would be fodder for a federal charge. Rather, federal bribery requires an *exchange*—the *purchase* of official action. *Sun-Diamond*, 526 U.S. at 404-05. Anything less renders the Supreme Court's corruption precedents a paper barrier to prosecutorial ambition, and threatens to transform the federal corruption statutes into broad licenses for prosecutors to superintend daily politics.

### B. The Government Did Not Prove a *Quid Pro Quo* for Official Action.

The Government's theory here was that SZNW committed bribery because, in showering Huizar with gifts, the Chairman intended to "give, give, give until one day [he] ha[d] a big ask." 11-ER-2495. But that is a rough definition of goodwill gifts; it is not a theory of bribery. A gift provided on the *expectation* it may one day prove useful is not one *traded in exchange* for anything. The Government failed to offer any evidence that SZNW engaged in any genuine *quid pro quo*. It thus did not prove bribery.

23

To be sure, the *quid* element was more than amply proven: For a half decade, Councilman Huizar enjoyed Chairman Huang's munificence. But the Government did not provide a sufficient evidentiary basis for the jury to find a *pro quo*—*i.e.*, that the gifts were part of a corrupt exchange for any official action on the L.A. Grand Hotel.

Foremost, all agree that Huang *never asked* Huizar to perform any official act for SZNW. Instead, Huang only asked Huizar to do things that officials do for constituents "all the time," such as arrange meetings or make calls. *McDonnell*, 579 U.S. at 575; *supra* at 10. The Government does not contend that any of those favors rose to the level of official action. Moreover, Huizar *never took* any meaningful action on the L.A. Grand redevelopment. Again, the Government admitted to the jury that Huizar did not push the project through PLUM, take any votes on the Council, or even pressure anyone else to support the project. 11-ER-2584-85. Moreover, as noted above, it was unclear whether Huizar *even could* do anything for the redevelopment, given term limits.[2]

---

[2] The Government admitted Huizar took "no official action beyond the 2014 resolution"—the commendation that honored Huang's economic contributions to the city. 11-ER-2585. The jury identified that resolution as an official act supporting one of the honest-services counts (Count 2). 1-ER-17. But that resolution alone cannot support even that solitary count. For one, a commendatory resolution does not involve a "formal exercise of governmental *power*," and is thus not an "official act." *McDonnell*, 579 U.S. at 574 (emphasis added); *see also id.* at 573 ("[s]imply expressing support" for something is not an "official act"). More important, there is "no evidence on the record" from which a reasonable jury could have found that Huang "understood [his gifts] were in exchange for" such a "resolution." *United States v. Silver*, 948 F.3d 538, 570 (2d Cir. 2020). The Government did not offer any evidence that Huang ever asked Huizar to do this, cared about a non-binding resolution, or thought his gifts were in return for one. Even Esparza characterized the resolution as a common thing Huizar did to show off for "friends of the office." 6-ER-1253.

In some circumstances, it may be possible to prove a *quid pro quo* even if no official action was ever sought or taken. The Government certainly looked for evidence to that effect: The FBI investigated for seven years, collected tens of thousands of e-mails and texts from Huizar, Esparza, and Zheng, and wiretapped their phones (and others'). *See, e.g.*, 9-ER-2075-76. It also obtained the cooperation of Huizar's and Huang's right-hand men, Esparza and Zheng, and secured Esparza's contemporaneous notes about Huizar and his dealings—notes that recounted even Huizar's illegal activity, including his pay-to-play schemes. *See, e.g.*, 6-ER-1357; *see also* 13-ER-3065 (indictment citing Esparza's notes for alleged parts of other pay-to-play schemes). Yet not only did the Government fail to find a single example of Huang asking Huizar for any official act—it did not even find any evidence insinuating an unspoken *quid pro quo*, be it a wink-and-nod, or a guilty acknowledgement by Huang that he was part of a corrupt exchange. (In fact, the evidence revealed the opposite. *See infra* Part III.)

Without any requests, action, or other evidence of a *quid pro quo*, the Government fell back to arguing that Huang wined-and-dined Huizar because of *who he was*—a powerful political figure who *could* help SZNW by advancing the L.A. Grand project. True enough that Huang did not pluck Huizar out of the blue. But that shows at most the "giving of gifts by reason of the recipient's mere tenure in office." *Sun-Diamond*, 526 U.S. at 408. After all, *every* gift to *every* politician is designed to "build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts." *Id.* at 405. Why else do it? Still, such ingratiation is not bribery. *See id.*

25

The Government's own framing of its case proves its conflation of goodwill gifts with bribes. Prosecutors repeatedly called Huang's gifts a "purposeful gamble" and a "calculated investment[]"—that after years of ingratiation, Huizar would be willing to help the redevelopment *if* the need arose and the circumstances aligned. 11-ER-2486; *see also, e.g.*, 2-ER-251-52, -258 (branding gifts as "investment" across opening); 6-ER-1368 (describing gifts as "investment with Huizar in case Huang needed anything"). That was how the Chairman thought of it too, per the *Government's witnesses*: "strictly an investment." 5-ER-1097-98; *see also* 6-ER-1364, -1378, -1380. This confirms SZNW's point: A "gamble" or "investment" is not an *exchange* for official action at the time of the gift; it is a *hope* that cultivating generalized goodwill will redound to the giver's benefit later. But "[v]ague expectations of some future benefit should not be sufficient to make a payment a bribe." *United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993).

Likewise, the Government's constant refrain—its entire theory of the case—was that SZNW committed bribery because Huang's intent was to "give, give, give until one day [he] ha[d] a big ask." 11-ER-2495; *see also, e.g.*, 5-ER-1097; 6-ER-1377; 9-ER-1913; 11-ER-2590. That too bespeaks ingratiation—not bribery. If giving precedes any ask, there is by definition no exchange "at the time" of the gifts, *McDonnell*, 579 U.S. at 572: The official has not agreed his actions will be "controlled by the terms of [a] promise." *McCormick*, 500 U.S. at 273. And if the nature of the ask is still unknown, accepting the gift cannot evince a sufficiently clear *quid pro quo* that embraces "official action" (versus unofficial support or courtesies). *United States v. Silver*, 948 F.3d 538, 577 (2d Cir. 2020).

26

And of course, even if a "big ask" could turn prior gifts into bribes retroactively, *no "big ask" ever came.* Tellingly, even the Government thought this was a problem—at least at the grand jury stage. There, prosecutors claimed that Huang planned to make specific demands to Huizar during a trip to Cabo: Grant the "big ask" or the gift will stop. 13-ER-3058. As the court observed, this was an "important overt act," 5-ER-1161, without which "the elements of the charged offenses may not have been met," 12-ER-2878. But the Government expressly *abandoned* it at trial. 5-ER-1162. Instead:

> There didn't have to be the big ask. Their entire relationship was the big ask. It was founded on the premise that Jose Huizar had power to do something that Chairman Huang wanted, and Chairman Huang was willing to pay for it. 11-ER-2590.

The federal bribery laws require more. A "relationship" is not official action; cultivating a relationship is not bribery; and giving gifts to officials because they have "power" is the definition of ingratiation. That Huang may have hoped or intended his gifts would earn him Huizar's assistance, should he need it down the line, cannot substantiate the genuine *quid pro quo* that bribery law demands to convict.

In short, the Government offered ample proof for a jury to conclude that Huang engaged in purposeful ingratiation—the steady accumulation of goodwill in service of certain ends. But it did not prove bribery, because it offered no evidence of any *exchange.* In other words, the Government did not prove that Huang gave the gifts as "part of an illicit *quid pro quo*," as opposed to for "legitimate donor influence or access." *Cruz*, 142 S. Ct. at 1654. That is legally insufficient.

27

**C.    At Minimum, the Jury Instructions Failed To Distinguish *Quid Pro Quo* Bribery From Lawful Ingratiation.**

Even assuming the Government's evidence was sufficient to allow a jury to infer *quid pro quo* bribery, a new trial would still be required because the jury instructions failed to provide "fair[] and adequate[]" guidance on the fundamental line between a goodwill gift and an illicit bribe. *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996); *see also Percoco v. United States*, 143 S. Ct. 1130, 1138 (2023) (reversing bribery conviction where jury instructions failed to define crime with "sufficient definiteness"). Since that dichotomy was the crucial issue in the case and the fulcrum of SZNW's defense, this ambiguity in the jury instructions at minimum compels a new trial.

1.    In defining bribery for the jury, the district court employed phrases that gave the impression it was sufficient to convict if Huang intended to receive official acts as a downstream consequence of his gifts—even if they were not part of any *quid pro quo* agreement. As to the Travel Act counts, the court instructed that a bribe is anything of value given "with the corrupt intent to unlawfully influence" the recipient's actions or opinions. 1-ER-55. As to federal programs bribery, the court likewise instructed that the Government must prove only that Huang "intended to influence" Huizar or Esparza "in connection with" the redevelopment. 1-ER-56. And as to honest-services fraud, the instructions described bribery as giving benefits while "intending … to receive in exchange at least one official act." 1-ER-48.

28

Standing alone, those formulations fail to distinguish the impermissible intent to receive official acts as "part of an illicit *quid pro quo*," from the permissible intent to build goodwill that leads to official acts through "legitimate donor influence or access." *Cruz*, 142 S. Ct. at 1654. The district court's instructions thus allowed the jury to convict if it concluded that the Chairman's largesse was intended to curry favor so that, if and when the time came for a "big ask," Huizar would oblige. But as shown, that is not "bribery" under federal law. *See supra* Part I.A.

To clarify the point, SZNW proposed an instruction for "[a]ll counts" that would have required the jury to find that Huang provided gifts "in exchange for Councilman Huizar's *agreement* to take one or more of the specified official acts to benefit the L.A. Grand Hotel project." 1-ER-172 (emphasis added). That language would have made clear that bribery occurs only if gifts are intended to solicit an *agreement* whereby the official promises to take official action as part of a genuine *quid pro quo*.

The Government resisted, objecting that one can still be guilty of offering a bribe even if the official declines the solicitation. *See* 1-ER-119-20. In that sense, no "meeting of the minds" is necessary. *E.g.*, *United States v. Jacobs*, 431 F.2d 754, 759-60 (2d Cir. 1970). True—but the giver must at least *intend* the gifts to be part of an agreement, *i.e.*, as a trade for official action. Anyway, the Government's theory was not that Huang offered a bribe but Huizar spurned it; its theory was that the parties formed an implicit agreement. So the jury should have been instructed to find one. Yet the instructions instead implied that mere intent to benefit from goodwill gifts could suffice.

29

2.     Making matters worse, the district court also rejected SZNW's proposal to instruct the jury on the bounds of lawful ingratiation. That proposal would have made clear that one who gives gifts "to ingratiate himself or obtain access to the public official," even if "motivated by some generalized hope or expectation of ultimate benefit," does not thereby commit bribery. 1-ER-171. There must instead be an intent to give the gift "specifically … in exchange for an official act." *Id.*

The district court refused to give that instruction or to do anything else to explain to the jury the degree to which gifts can lawfully be used to build political capital. That was error. An instruction like this may not be necessary in every public corruption case. But where, as here, the Government rests its case on a stream of benefits provided by the defendant, with no evidence of a request for official action or provision of official action, something more is needed. *See United States v. Sawyer*, 85 F.3d 713, 741 (1st Cir. 1996) ("But where … the line between the merely unattractive and actually criminal conduct is blurred, the court must take pains to explain the difference to the jury" between the "cultivation" of a "political friendship" and "bribery."). Without sufficient guidance, it is too easy for a prosecutor to make the unseemliness of ingratiation appear criminal. That is *precisely* what the Government did here, treating the fact that Huang provided Huizar with lavish gifts as if it were evidence of bribery:

> Do you think for one second that Chairman Huang would have taken Jose Huizar to Vegas if he were a teacher or a receptionist or a mechanic? … Wei Huang took Jose Huizar, because as a councilmember, he had the power to approve the redevelopment of the L.A. Grand Hotel. 11-ER-2496.

But cozying up to the powerful is not bribery. That was SZNW's defense. And SZNW had a "constitutional right to have the jury instructed … to his theory of the case." *United States v. Marguet-Pillado*, 648 F.3d 1001, 1006 (9th Cir. 2011). The court's failure to "cover that defense theory" in its instructions "warrants per se reversal." *Id.*

### D.    These Errors Taint All of the Counts.

The legal failures discussed above are fatal to all counts, since the "essence of the offense" is the same across the different federal bribery statutes. *Evans*, 504 U.S. at 278 (Kennedy, J., concurring in part and in judgment). Federal bribery requires a genuine *quid pro quo* across the board; acquittal or a new trial is thus required for all of the bribery charges—under the honest-services statute, § 666, and Travel Act alike.

**1.**    SZNW's honest-services convictions are straightforward. It is clear that honest-services bribery requires a *quid pro quo*. *See McDonnell*, 579 U.S. at 574; *see also, e.g.*, *United States v. Kincaid-Chauncey*, 556 F.3d 923, 942-43 (9th Cir. 2009) (same).

**2.**    SZNW's single federal-programs bribery conviction cannot stand either. That statute makes it a crime to give or agree to give something of value "with intent to influence or reward an agent of [a state or local government] … in connection with any business, transaction, or series of transactions of [that government]." 18 U.S.C. § 666(a)(2). While § 666's text differs in some respects from § 201, the two laws address the same fundamental offense. Indeed, both the First and Fifth Circuits have squarely held that § 666 too "requires a *quid pro quo*." *United States v. Hamilton*, 46 F.4th 389, 399 (5th Cir. 2022); *see also United States v. Fernandez*, 722 F.3d 1, 24-26 (1st Cir. 2013).

31

That interpretation accords with the law's history. Lower courts had originally split over whether § 201, which applies to *federal* officials, also extended to *state and local* officials. *Sabri v. United States*, 541 U.S. 600, 606-07 (2004). Congress enacted § 666 to settle any doubt. *Salinas v. United States*, 522 U.S. 52, 58 (1997); *Fernandez*, 722 F.3d at 20; S. Rep. No. 98-225, at 369 (1983) (explaining that § 666 resolves "doubt as to whether" § 201 covers local officials). The statutory objective was thus to extend § 201's *scope*, not to expand its *substance*. *See* S. Rep. No. 98-225, at 369; *Sabri*, 541 U.S. at 607. In fact, Congress amended § 666 two years after enactment to bring it closer in line with § 201's bribery provision. *Hamilton*, 46 F.4th at 395 (detailing statutory history). It did so "to avoid" any "possible application" of § 666 to "acceptable commercial and business practices," *i.e.*, lobbying and gift-giving. H.R.Rep. No. 99-797, at 30 (1986); *see also Fernandez*, 722 F.3d at 21-26. So, just as § 201 requires a *quid pro quo* for official action, *see McDonnell*, 579 U.S. at 574, so too § 666.

Section 666's text accords with its history; its language "tracks closely" that of § 201(b). *Hamilton*, 46 F.4th at 397. The statute bars giving something of value "with intent to influence or reward" official conduct. 18 U.S.C. § 666(a)(2). The Supreme Court has twice held that such "intent to influence" language means a *quid pro quo*. *McDonnell*, 579 U.S. at 574; *Sun-Diamond*, 526 U.S. at 404-05. While § 666 also uses the word "reward," that can easily be read—in accord "with the traditional meaning of the term"—to cover a bribe paid *after* an official does the bargained-for act, whereas "intent to influence" refers to payments *before* the act. *Fernandez*, 722 F.3d at 22-23.

32

Some courts—though not this one—have construed § 666 as stretching further, to mere gratuities. *United States v. Snyder*, 71 F.4th 555, 579 (7th Cir. 2023) (collecting cases), *cert. pet. pending*, No. 23-108 (U.S.). That broader reading, however, contravenes the Supreme Court's admonition that "a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter." *Sun-Diamond*, 526 U.S. at 412. Moreover, the broader interpretation does not fit with § 666's penalty provision: a maximum of ten years' imprisonment, far more than § 201's two-year maximum for gratuity offenses (18 U.S.C. § 201(c)). Why would Congress penalize gratuities to *state and local* officials five times more harshly than those to *federal* officials? Nor can this reading be reconciled with § 666's inclusion of the "corruptly" *mens rea*, which has long been treated as a core distinction between bribes and gratuities. *See Fernandez*, 722 F.3d at 23-24; *Hamilton*, 46 F.4th at 395.[3]

In short, the First and Fifth Circuits correctly read § 666 as aligned with other federal bribery statutes in demanding a *quid pro quo*. As such, the failure of proof equally demands acquittal on Count 23. And the instructional errors equally compel a new trial on that count. *See United States v. Lindberg*, 39 F.4th 151, 163-65 (4th Cir. 2022) (requiring new trial on § 666 count based on error in "official act" instructions).

---

[3] In *United States v. Garrido*, this Court said, without analysis, that § 666 does not require a *quid pro quo*. 713 F.3d 985, 997 n.10, 1002 (9th Cir. 2013). But this was pure dicta. The only issue in *Garrido* was whether § 666 required an *official act*. *Id.* at 999; *see also id.* at 1002 (stating "hold[ing]" as "'§ 666 does not require … an official act'"). That is why federal appeals courts on both sides of the *quid pro quo* split have not included this Court in either camp. *See Hamilton*, 46 F.4th at 396; *Snyder*, 71 F.4th at 579.

**3.** Finally, the Travel Act counts must fall with the rest. As explained next, the Travel Act was passed in concert with the federal-official bribery statute, § 201, and embraces the same understanding of "bribery." *See infra* Part II. Section 201, again, expressly requires a *quid pro quo* for official action. *See McDonnell*, 579 U.S. at 574. The sufficiency and instructional errors surrounding this element therefore taint the Travel Act convictions just as they taint the honest-services and § 666 convictions (though, as explained below, the Travel Act counts also fail on independent legal grounds).

*     *     *

The issue in this appeal is not whether public officials should be permitted to accept gifts from those who have or may have business before them. That is a matter of *ethics regulation* for *state and local* law. The question here is whether the Government proved *criminal bribery* under *federal* law. And the Supreme Court has without exception rejected attempts by federal prosecutors to exploit "tawdry tales" to expand the scope of the federal bribery laws. *McDonnell*, 579 U.S. at 580; *see also, e.g., Percoco*, 143 S. Ct. at 1138. Federal bribery is a discrete offense; it is not a catchall for eradicating all notions of "corruption" at every level of government. And the distinct requirement of federal bribery—in all its applications—is that there must be evidence of an intended exchange for official acts. Whatever can be said about the Chairman's behavior, the Government offered zero evidence of *that*. Acquittal is thus warranted on all counts. At minimum, the Court should order a new trial, where the jury is properly instructed on the core distinction between lawful ingratiation and actionable corruption.

34

## II. THE TRAVEL ACT CONVICTIONS INDEPENDENTLY FAIL.

Even apart from the fundamental defects discussed above, SZNW's convictions under the Travel Act independently fail as a matter of law. The Travel Act makes it illegal to travel or use "interstate or foreign commerce" with intent to commit (as relevant here) "bribery" in violation of state law. 18 U.S.C. § 1952. Because the Act does not define "bribery," courts use the generic definition of bribery at the time the Travel Act was enacted (1961), and apply a categorical approach to determine whether a state law may serve as a predicate. *See Perrin v. United States*, 444 U.S. 37, 42 (1979); *United States v. Chi*, 936 F.3d 888, 894-95 (9th Cir. 2019).

The convictions here were premised on violations of California's bribery statutes. 13-ER-3140. But California's bribery laws are incredibly broad. Sections 67.5, 85, and 165 of California's Penal Code proscribe anything given to "influence" even an official's mere "opinion" on a matter. 13-ER-2988. California courts—unlike their federal counterparts—have not read the "influence" language as requiring a *quid pro quo*. *See, e.g., People v. Gaio*, 81 Cal. App. 4th 919, 928-29 & n.8 (2000). And there is no doubt that the conduct covered by California's statutes—any "vote, action, or opinion"—stretches beyond the federal sense of an "official act." *McDonnell*, 579 U.S. at 575. The Government agreed on these points about California law. *See, e.g.*, 1-ER-156, -173, -180. The district court did too, 13-ER-2988, and instructed the jury accordingly, 1-ER-53-55.

These capacious statutes cannot serve as predicate offenses under the Travel Act, because they well exceed the generic definition of bribery as of 1961—which required both a *quid pro quo* and an official act. All signs point in this direction. *See Chi*, 936 F.3d at 895-96 (outlining typical sources for analysis of generic definitions of bribery).

Section 201. It takes no divination to know what the Congress that enacted the Travel Act thought "bribery" meant, because that same Congress enacted § 201—"the federal bribery statute." *McDonnell*, 579 U.S. at 562. Indeed, while "the Travel Act was passed in 1961 and [§ 201 was] passed in 1962, the provisions were considered and enacted by the same congress," as part of a general project to revise federal corruption laws. *United States v. Biaggi*, 674 F. Supp. 86, 88-89 (E.D.N.Y. 1987). And the legislative history reveals that Congress understood § 201 to be "clarifying and consolidating the bribery laws as they currently existed"—*i.e.*, restating bribery's generic definition. *Id.*

Model Penal Code. Of a piece, the American Law Institute's 1962 proposed draft Model Penal Code defined bribery as offering, giving, soliciting, or accepting a private benefit as "consideration" for an official act. Model Penal Code § 240.1(1) (Am. L. Inst., Proposed Official Draft 1962); *see also* Alschuler, *supra*, at 472-73. ALI made plain this definition would preclude "application of the bribery sanction to situations where gifts are given in the mere hope of influence." Model Penal Code § 240.1(1), note on status of section (Am. L. Inst., Proposed Official Draft 1962). Most important, it explained that its definition of bribery—involving a *quid pro quo* and official act— reflected the era's "more conventional formula in bribery legislation." *Id.*

36

<u>Treatises/Dictionaries.</u>  Leading contemporary treatises defined bribery in the same manner.  *See, e.g.*, 3 Wharton's Criminal Law and Procedure 771 (Anderson 1957) ("Bribery is the offense of giving or receiving money or anything of value *in return for which* a public officer agrees to do or to refrain from doing an act, contrary to his legal duty." (emphasis added)); *id.* at 776 ("The agreement is the essence of the offense."); R. Perkins, Criminal Law 397 (1957) ("Bribery is the corrupt tender or receipt of a private price for official action."); *id.* at 403 (bribery is a "corrupt agreement"); J.P. Bishop, Criminal Law 62 (1923) ("Bribery is the voluntary giving or receiving of anything of value in a corrupt payment for an official act, done or to be done.").  Dictionaries sometimes included both the predominant definition and broader formulations turning on mere influence, *see, e.g.*, Black's Law Dictionary 239 (4th ed. 1951), but "in the main" they nonetheless required a "specific official act," *Biaggi*, 674 F. Supp. at 87.

<u>State Practice.</u>  As of 1961, most state courts applied a view of bribery that required both a *quid pro quo* and an official act.[4]  And on the heels of the 1962 ALI draft, over "two-thirds of the states" came to adopt its definition.  Alschuler, *supra*, at 473 & n.55; *see also Biaggi*, 674 F. Supp. at 88 (collecting state laws).

---

[4] *Selvidge v. State*, 126 Tex. Crim. 489, 490 (Tex. Crim. App. 1934) ("To constitute bribery of a public official it must be made to appear that the official for a valuable consideration or reward agreed to refrain from performing an official act imposed upon him by law."); *see also, e.g.*, *State v. Ferraro*, 67 Ariz. 397, 401 (Ariz. 1948); *State v. Davis*, 45 A. 394, 395 (Del. 1899); *Republic of Hawaii v. Young Hee*, 10 Haw. 114, 116 (Haw. 1895); *Commonwealth v. Albert*, 29 NE.2d 817, 819 (Mass. 1940); *State v. Durnam*, 73 Minn. 150, 159 (Minn. 1898); *People v. Kohut*, 282 N.E.2d 312, 319 (N.Y. 1972); *Osborn v. State*, 28 S.W.2d 47, 48 (Tenn. 1930); *State v. Hart*, 136 Wash. 278, 281-82 (Wash. 1925).

It is therefore abundantly clear that generic bribery as of 1961—unlike California bribery law today—meant a *quid pro quo* for official action. But the district court held otherwise. 13-ER-2977-90. Relying mostly on this Court's decision in *Chi*—which analyzed a different law (18 U.S.C. § 1957) passed at a different time (2001)—the court held that generic bribery only requires a payment to "influence" an official's conduct, not a *quid pro quo*; and that the influenced conduct need not be an "official act" in the *McDonnell* sense. *See* 13-ER-2989-90. That is wrong on both scores.

In *Chi*, this Court held that the generic definition of bribery as of 2001 involved three elements: that (i) there be "two parties" (a giver and a receiver), (ii) "something [is] given by the bribe-giver," and (iii) "something [is] given by the bribe-taker." 936 F.3d at 897. Critically, this third element signifies a *quid pro quo*—where the bribe-taker "acted *in consideration of* and *in exchange for* the money he received." *Id.* at 898 (emphases added). Indeed, even the Government in *Chi* underscored that an "exchange" was "the essence of a bribery offense." U.S. Br., 2018 WL 3018747, at *31-32 (June 11, 2018).

That alone is fatal to the Travel Act counts. Again, the California bribery laws do not require a payment be made *in exchange* for anything; they define a bribe as any payment to *influence* official conduct. *See, e.g., Gaio*, 81 Cal. App. 4th at 928-29; *see also* Judicial Council of California Criminal Jury Instructions § 2600 (2021) (defendant must act with "the corrupt intent to unlawfully influence"). Those are fundamentally divergent conceptions of bribery. *See* Alschuler, *supra*, at 474 (federal bribery law goes beyond mere "intent to influence" and requires *quid pro quo* "exchange"). The district

38

court missed this distinction, and so mistakenly held that California's bribery laws satisfied *Chi*'s definition of generic bribery as of 2001. (Of course, the evidence that generic bribery required a *quid pro quo* as of *1961* is even stronger, as set forth above.)

The district court also held that the generic definition of bribery did not require an "official act" (as understood by *McDonnell*). The court characterized *McDonnell* as creating a new gloss on § 201 that was added "over 50 years after the Travel Act was enacted." 13-ER-2982. Not so. *McDonnell* did not purport to amend a statute; it interpreted § 201 *as enacted*, and cited precedents that *predated* the Travel Act. 579 U.S. at 573-74 (citing *United States v. Birdsall*, 233 U.S. 223 (1914)). The district court also invoked *Chi* for the proposition that generic bribery is distinct from bribery under the "federal bribery statute." *Id.* at 580. But *Chi* simply noted that § 201 had no particular relevance, compared to any other bribery law, for deciding what is bribery under § 1957. 936 F.3d at 896. The latter statute, however, was passed in 2001, decades after § 201; the Travel Act, by contrast, was considered and passed alongside § 201.

Even the Government accepted below that sustaining the Travel Act convictions requires reading the Travel Act "broadly." ECF 259, at 29. That runs headlong into three-plus decades of Supreme Court precedent on how read federal corruption laws.[5] This Court should grant acquittal on these counts even if it upholds the rest.

---

[5] *See, e.g.*, *Percoco*, 598 U.S. 319; *Ciminelli v. United States*, 598 U.S. 306 (2023); *Kelly v. United States*, 140 S. Ct. 1565 (2020); *McDonnell*, 579 U.S. 550; *Skilling*, 561 U.S. 358; *Cleveland v. United States*, 531 U.S. 12 (2000); *McNally v. United States*, 483 U.S. 350 (1987).

## III.   AT MINIMUM, SZNW IS ENTITLED TO A NEW TRIAL.

If nothing else, SZNW had the right to mount a meaningful defense.  But errors below stood in the way: The district court wrongly permitted the Government to secure convictions against *SZNW* by putting *Councilman Huizar* on trial.

The Government's case rested on convincing the jury that Chairman Huang's gifts to Councilman Huizar were intended not simply to earn him goodwill, but to buy him specific official action.  Yet the Government had no evidence to prove this.  Again, after almost a decade of government investigation, there was zero evidence Huang *ever* asked Huizar to perform a single official act.  Nor was there evidence of Huizar doing *anything* meaningful to move the L.A. Grand redevelopment through the Council.

So with no ask and no act, how did the Government try to prove bribery?  By pointing to what *Huizar* did on his own, and what he did with *others*, all in illicit schemes that Huang knew nothing about.  Over objection, the Government put on significant evidence about Huizar's pay-to-play dealings with *other* people in *unrelated* real-estate projects.  That allowed the Government to brand Huang before the jury as just another corrupt developer, buying an illicit product everyone knew Huizar was selling.  That tactic is paradigmatically prejudicial.  Making matters worse, the district court wrongly excluded evidence that would have rebutted the Government's tactic by showing that Huang, unlike others, never understood his gifts to be part of any sort of *quid pro quo*.  These errors, especially in combination, warrant a new trial, even assuming the Government is correct on all the legal issues above.

40

1.    Jose Huizar was a crook.  He ran a series of "pay-to-play" schemes, whereby real estate developers gave him bribes in return for official acts on their behalf.  5-ER-985-87.  The Chairman did not know anything about this.  *See, e.g.*, 12-ER-2833 (district court finding that "Government has made no attempt to demonstrate that [SZNW] was a knowing participant" in broader pay-to-play schemes).

But that did not stop the Government from running with it at trial.  It used its star witness—George Esparza, Huizar's right-hand man—to frame the case in these terms.  Before even turning to SZNW, Esparza explained that he helped Huizar run a series of pay-to-play schemes out of their office, and pled guilty to a RICO charge as a result.  5-ER-985-87.  He talked about how developers would be deemed "friends of the office," and outlined the perks that came with the designation—such as "full access" to Huizar and his staff.  5-ER-989-90.  On redirect, the Government again began *not* with Huizar's interactions with Huang, but rather his relations with *others*.  It played for the jury a May 2017 call where Esparza commented to another staffer that he was handling Huizar's "other little tranzas'" (*i.e.* crooked deals), which Esparza explained was in reference to Huizar's many separate "pay-to-play schemes."  6-ER-1370.

With this context, the Government took every effort to characterize this case as simply "part of [that] pay-to-play scheme."  5-ER-1066-67; *see also, e.g.*, 5-ER-991-92, -994, -1098; 6-ER-1198, -1358, -1370.  It did not miss a chance to label Huang a "friend of the office."  *E.g.*, 4-ER-669-70; 5-ER-992, -1089, -1098-1108; 6-ER-1374.  Or to emphasize the "full access" the Chairman received.  *E.g.*, 5-ER-987; 6-ER-1382, -1390.

In a similar vein, the district court allowed the Government to call multiple witnesses to testify about how Huizar laundered the money he received from his pay-to-play schemes (along with the chips he pocketed in Vegas)—another thing Huang *did not know about*. Indeed, *three* of the Government's 12 witnesses—a quarter of its overall case—were Huizar's family members (his mother, brother, and ex-wife), all of whom (along with a multitude of exhibits) made the same point: Huizar took advantage of each, and used them to hide money from his escapades. *See, e.g.*, 8-ER-1732-38 (mother); 9-ER-1970-77 (brother), -2001-09 (wife). Huizar's mother—an elderly woman who needed help getting to the witness stand and reading exhibits in the courtroom—explained how her son wheedled her into using her bank account to wash funds. 8-ER-1731-32. So too his brother, whom Huizar told it was best "not to know" where the cash was from. 9-ER-1977. Most compelling was Huizar's (soon-to-be-ex) wife. Beyond testifying about similar money-laundering—detailing, for example, how she found wads of hundreds hidden in Huizar's closet (9-ER-2000)—she regaled them with stories of how Huizar was a terrible person: cheating on her, missing his kids' events to gamble with the Chairman, even leaving her to eat alone in a hotel room on a promised romantic weekend so he could do the same. *See, e.g.*, 9-ER-1998-2000.

The upshot was apparent: Huizar was a bad actor and—more important—so was everyone around him. The Government's closing captures this stratagem perfectly. Ahead of discussing "how the *defendant's* bribery scheme worked," it focused first on how Huizar worked with *other* people. 11-ER-2495 (emphasis added):

> Here's the other fact you learned about Jose Huizar at trial:
> He was the leader of a pay-to-play scheme in Los Angeles.
> This was a corrupt official who took bribes and in exchange,
> agreed to push development projects forward, which brings
> us to the defendant's plan to invest in a corrupt relationship
> with Jose Huizar by providing benefits to Huizar, intending
> to receive in exchange official acts to benefit the billion-
> dollar project. In other words, Wei Huang paid-to-play. He
> became the friend of the office … . *Id.*

**2.** The Government should not have been allowed to do this. For starters,

Huizar's distinct interactions with *other developers* (much less his mistreatment of his ex-

wife and children) had no relevance to his interactions with SZNW. Again, the district

court had already found that Huizar's pay-to-play operation was not a single scheme,

so this evidence could not be used as direct evidence of a single conspiracy. 12-ER-

2833. The entire point of this material was thus to insinuate that because Huizar

engaged in bribes with *other people*, Huang's relationship with him was surely illicit too.

But "[e]vidence that demonstrates only 'guilt by association' … is irrelevant to the

question of a defendant's actual guilt." *United States v. Lopez-Medina*, 461 F.3d 724, 741-

42 (6th Cir. 2006).

Even if relevant, this sort of "other acts" evidence would fall in the heartland of

Federal Rule of Evidence 404(b). That rule presumptively prohibits evidence of any

"other crime, wrong, or act … to prove a person's character in order to show that on a

particular occasion the person acted in accordance with the character." And that Rule

applies not only to the defendant himself, but also to those *associated* with him. *See, e.g.,*

*United States v. McCourt*, 925 F.2d 1229, 1235 (9th Cir. 1991).

43

While Rule 404(b) includes certain exceptions, it is the Government's burden to show that evidence fits within "one of the exceptions to the general exclusionary rule of Rule 404(b)." *United States v. Holiday*, 998 F.3d 888, 895 (9th Cir. 2021). Here, the Government made no effort to shoulder that burden. 12-ER-2833; ECF 649, at 8-11. Nor could it. There was no "propensity-free chain of reasoning" to connect Huizar's general pay-to-play schemes with SZNW's specific conduct. *United States v. Rodriguez*, 880 F.3d 1151, 1168 (9th Cir. 2018).

Rather than invoke any exception, the district court reasoned that Rule 404(b) did not apply in the first place because the "general framework" of Huizar's pay-to-play scheme was necessary to present a "coherent and comprehensible story," and was thus "inextricably intertwined" with the charges against SZNW. 12-ER-2834.

This was error. This Court has long cautioned trial courts to "be extremely careful to guard against" Rule 404(b) evidence, lest a defendant be convicted based on something other than his own behavior in the offense charged. *United States v. Bailleaux*, 685 F.2d 1105, 1109 (9th Cir. 1982). And the "inextricably intertwined" doctrine, in particular, must be "narrowly circumscribed and limited." *United States v. Charley*, 1 F.4th 637, 647 (9th Cir. 2021).[6] As relevant, it applies only where the Government *cannot* "present[] the evidence relevant to its case against the defendant … without" the Rule

---

[6] Indeed, a growing number of courts have abandoned it altogether, on the ground it has become "vague, overbroad, and prone to abuse." *United States v. Fuertes*, 805 F.3d 485, 494 n.4 (4th Cir. 2015) (collecting cases).

404(b) material—such as by explaining in a felon-in-possession case the circumstances in which the defendant possessed the firearm. *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012-13 (9th Cir. 1995). That is not this case. The Government charged SZNW with bribing Huizar with regard to the L.A. Grand Hotel. It could obviously tell a "coherent and comprehensible story" without talking about how Huizar accepted *other* bribes from *other* people in *unrelated* matters that SZNW *did not know about*. *See, e.g.*, *United States v. Cross*, 308 F.3d 308, 320 (3d Cir. 2002) (even where evidence helps prove a "broader conspiracy," it is not "inextricably intertwined" with charged offense unless it "directly prove[s]" it). It just would not have been a very *compelling* story.

At minimum, any probative value this evidence had was dwarfed by its prejudicial effects. *See United States v. Mayans*, 17 F.3d 1174, 1183 (9th Cir. 1994) ("This circuit has specifically incorporated Rule 403's probative value/unfair prejudice balancing requirement into the Rule 404(b) inquiry."). Again, the fact that Huizar took bribes from others says *nothing* about *Huang's* mindset. But such information would obviously taint Huang's actions in the eyes of the jury—that is why the Government featured it so prominently. Rule 403 is supposed to prevent that. It is why this Court excludes the "use of gang membership" to prove a crime; by the same token, the fact that the Chairman interacted with a corrupt enterprise (Huizar and his staff) is not permissible evidence that the Chairman engaged in its crimes. *See, e.g.*, *Kennedy v. Lockyer*, 379 F.3d 1041, 1055-56 (9th Cir. 2004). Given this imbalance, the evidence was inadmissible. *See, e.g.*, *United States v. Wells*, 879 F.3d 900, 929-30 (9th Cir. 2018).

The district court thus erred by admitting the Huizar-centric evidence. *See United States v. Martinez*, 994 F.3d 1, 14 (1st Cir. 2021) (evidence about distinct bribery scheme involving same politician should be "limited" by Rules 404(b) and 403). And due to those mistakes, the Government was able to unfairly color SZNW as just another bribery-driven developer partaking in Huizar's corrupt operation.

**3.** Compounding the problem, the district court excluded key evidence that would have shown Huang did not think he was part of any pay-to-play. Ricky Zheng—Huang's right-hand man—testified that he and others in Huang's circle had expressed concern to him about his relationship with Huizar, given the latter's status as a public official. 8-ER-1778-80. On cross-examination, defense counsel tried to ask Zheng about how Huang responded. 8-ER-1835-37. The answer would have been that Huang said "they were just having fun" and "not doing anything wrong" because Huang "had not asked Mr. Huizar for anything." 12-ER-2658-59.

But the district court kept this second half of the conversation from the jury on hearsay grounds. This too was serious error. To start, Huang's statements were not hearsay *at all*, because they were not offered for the truth; the point of this testimony was not to prove that Huang *actually* did not ask Huizar for any official acts—a fact that was, again, undisputed—but rather that Huang was personally not *concerned* about his gift-giving because he did not *believe* he was part of any exchange. Regardless, even if hearsay, Huang's statements would comfortably fall within the state-of-mind exception. Fed. R. Evid. 803(3). When a statement is offered for the belief it reflects rather than

the facts it recites, it is not hearsay. *Wagner v. Cty. of Maricopa*, 747 F.3d 1048, 1052-53 (9th Cir. 2013). And if there was any concern about the jury misunderstanding the purpose of the testimony, a limiting instruction could have been provided. *See, e.g.*, *United States v. Huguez-Ibarra*, 954 F.2d 546, 552 (9th Cir. 1992).

Independently, Huang's response also falls squarely within the common-law rule of completeness, under which a party "against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171 (1988). This rule "was designed to prevent the Government from offering a 'misleadingly-tailored snippet.'" *United States v. Castro-Cabrera*, 534 F. Supp. 2d 1156, 1160-61 & n.6 (C.D. Cal. 2008) (quoting *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996)). Especially so where the snippet involves a *criminal defendant's* speech, putting him to the choice of "leaving the government's distorted presentation unanswered and surrendering the Fifth Amendment right not to testify." *United States v. Quinones-Chavez*, 641 F. App'x 722, 731 (9th Cir. 2016) (Fisher, J., concurring in part, dissenting in part, and concurring in judgment) (collecting cases).

Without any context, Zheng's testimony gave the impression that Huang blew past his friends' concerns, and (quite suspiciously) kept plying Huizar with gifts. But the context would have showed the opposite: The Chairman assured them everything was above board, in that he was not asking Huizar for anything in exchange. If that is not averting a "misunderstanding," then nothing is.

**4.**    Especially together, these errors were prejudicial.   Taking Huang's conduct alone, the Government offered no evidence to separate his behavior from innocent (albeit lavish) gift-giving.   It instead tried to prove its case through *Huizar's* behavior, and in particular how he corruptly interacted with *others*.   The Government first established Huizar was a "corrupt public official who took bribes and in exchange[] agreed to push development projects forward."   11-ER-2495.   Then the Government spent the rest of its efforts on branding Huang as just another developer looking to pay to play: Huang was engaging in bribery, because *every* "friend of the office" was engaging in bribery.   The Government even used this tack to fill the gaps in its case.   Sure, there was no evidence of Huang asking for anything.   But Esparza testified he was told from "early on" never to use *quid pro quo* language when soliciting a bribe.   5-ER-991.   A *lack* of evidence thereby became *affirmative proof*: It was "part of the design of the pay-to-play scheme, never to speak directly about wanting this for that."   11-ER-2507.

That tactic was devastating.   But it was also paradigmatically prejudicial.   *See, e.g.*, *Charley*, 1 F.4th at 651 (wrongful admission of "other acts" evidence is presumptively prejudicial).   The First Circuit recently held as much in the "Varsity Blues" cases, where the Government tried a similar tack.   *United States v. Abdelaziz*, 68 F.4th 1, 55 (1st Cir. 2023).   That case centered on two parents' interactions with a corrupt college consultant (Rick Singer), and turned on those parents' intent.   There, as here, the Government tried to prove the *defendants'* intent by introducing evidence about how *other parents* involved with Singer were knowingly involved in a bribery racket.   The First Circuit

unanimously vacated the convictions, reasoning that this prejudicial maneuver vitiated any chance the defendants received a fair trial based on *their own* conduct. *Id.*

The same should hold here. The prosecution's reliance on Huizar's conduct with *others* was "neither trivial nor fleeting"; it was a centerpiece of their case. *Charley*, 1 F.4th at 651. Even the trial court recognized—at least at one point—the prejudice inherent to this evidence, severing the defendants for trial. 12-ER-2890-97. But the court then undercut its own ruling by allowing admission of this "other act" evidence, and the Government took advantage of the court's ruling by making SZNW's trial about Huizar's willingness to "play" for "pay" from other developers.

No "overwhelming evidence" renders these errors harmless. *Charley*, 1 F.4th at 652. As noted, the historical facts were mostly undisputed; the case turned on Huang's intent. Beyond Huizar's pattern of corruption, the Government's other main evidence similarly tried to use *Huizar* to generate an inference about *Huang*. It focused extensively on how Huizar tried to conceal the relationship, such as by changing his name on flight manifests or having Esparza cash out his chips for him. 11-ER-2498-2502. As one telling example, in the direct examination of its final witness—the lead FBI agent, who testified at both the start and end of the prosecution's case—the Government spent almost 15 transcript pages on Huizar's concealment efforts (most of which Huang did not know about). 9-ER-2061-75. Of course, one would *expect* a politician to keep discreet his opulent travels with a Chinese national. So even assuming this had *some* *relevance* to *Huizar's* intent, it is certainly not *overwhelming* evidence of *Huang's* intent.

49

At bottom, there was "overwhelming" proof of what Huang *did*—he bestowed benefits on Huizar for years.  But that conduct is not inherently wrongful; it is no different in kind from what many lobbyists do every day.  Even on the Government's account, the case turned on intent—that is, Huang's unexpressed understanding behind his gifts.  And there was surely *not* "overwhelming" evidence of *that*.  As such, for the same reason the prosecution relied upon this evidence so much, a new trial is warranted: SZNW's fate with the jury was sealed through the actions of others.

## CONCLUSION

This Court should reverse the convictions, or at minimum order a new trial.


September 18, 2023                              Respectfully submitted,


Richard M. Steingard                    */s/ Yaakov M. Roth*
LAW OFFICES OF                         Yaakov M. Roth
RICHARD M. STEINGARD                   Harry S. Graver
724 Spring Street, 9th Floor           Alexis Zhang
Los Angeles, CA 90014                  JONES DAY
Telephone: (213) 260-9449              51 Louisiana Avenue, NW
rsteingard@steingardlaw.com            Washington, DC 20001
                                       Telephone: (202) 879-3939
                                       yroth@jonesday.com


*Counsel for Defendant-Appellant*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _____23-972_____

I am the attorney or self-represented party.

**This brief contains** _____13,970_____ **words,** excluding the items exempted by

Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App.

P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** _____*/s/ Yaakov M. Roth*_____ **Date** _____September 18, 2023_____

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on September 18, 2023.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated: September 18, 2023                    */s/ Yaakov M. Roth*
                                              Yaakov Roth