No. 23-972

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

SHEN ZHEN NEW WORLD I, LLC,
*Defendant-Appellant.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE CENTRAL DISTRICT OF CALIFORNIA*
*DISTRICT COURT NO. CR 20-00326-JFW-4*

## GOVERNMENT'S ANSWERING BRIEF

E. MARTIN ESTRADA
United States Attorney

BRAM M. ALDEN
Assistant United States Attorney
Chief, Criminal Appeals Section

SUSAN S. HAR
Assistant United States Attorney
Public Corruption & Civil Rights
Section

1500 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012
Telephone: (213) 894-3289
Email: susan.har@usdoj.gov

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

**DESCRIPTION**            **PAGE**

I.    INTRODUCTION ............................................................... 1

II.   ISSUES PRESENTED ....................................................... 4

III.  STATEMENT OF THE CASE ......................................... 5

    A.    Jurisdiction, Timeliness, and Bail Status ............................ 5

    B.    Statement of Facts and Procedural History .......................... 6

            1.    Defendant buys the LA Grand Hotel with the specific plan to redevelop it into the City's tallest skyscraper .................................................... 6

            2.    Huang meets Councilmember Jose Huizar and learns of his influence over the LA Grand Hotel redevelopment project .................................... 7

            3.    Huang and Huizar engage in a pay-to-play scheme ..................................................... 10

            4.    Huang and Huizar conceal their Vegas trips ............. 13

            5.    Huang saves Huizar's political seat by secretly paying a $600,000 bribe to settle a sexual-harassment lawsuit, and Huizar takes an official act for Huang ................................................ 14

            6.    Huang asks Huizar to support the redevelopment, and Huizar agrees because of Huang's bribes ............................................. 17

            7.    Huizar delivers on Huang's requests ......................... 19

            8.    The FBI closes in, Huang flees, and defendant is indicted ................................................... 20

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                           **PAGE**

        9.     Defendant is convicted ................................................. 22

              a.     The government and defense cases ..................... 22

              b.     The jury instructions ........................................ 24

              c.     The verdicts ...................................................... 26

IV.     SUMMARY OF ARGUMENT ......................................... 27

V.     ARGUMENT ...................................................................... 29

    A.     Sufficient Evidence Supports the Jury's Guilty Verdicts .... 29

        1.     Standard of review ......................................... 29

        2.     A defendant commits honest-services fraud based on bribery by giving a benefit with intent to receive an official act, even if the official neither performs nor agrees to perform that act. ................... 30

        3.     A rational trier of fact could easily find defendant committed the charged crimes ..................................... 35

              a.     Huang's statements and actions ........................ 35

              b.     Huizar's conduct after receiving benefits ........... 38

              c.     Huang's concealment efforts ............................. 40

              d.     Huang's flight ................................................... 41

    B.     The District Court's Jury Instructions Were Proper ........... 43

        1.     Standard of review ......................................... 43

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                    **PAGE**

2.  The district court did not err in refusing
    defendant's incorrect and duplicative instruction ....... 44

    a.  Defendant's instruction erroneously
        required an actual agreement or exchange ........ 44

    b.  Defendant's instruction erroneously
        required an express exchange and the
        identification of specific official acts ................... 48

    c.  Defendant's instruction on ingratiation was
        duplicative of the substantive count
        instructions ....................................................... 49

    d.  Defendant's ingratiation instruction lacked
        foundation, and any error was harmless ........... 52

C.  The Travel Act Convictions Should Be Affirmed ................. 53

    1.  Procedural background ............................................... 53

    2.  Standard of review ..................................................... 54

    3.  A categorical approach does not apply. ...................... 54

    4.  The government adopted a higher burden
        requiring the jury to find quid-pro-quo intent and
        an official act ............................................................. 56

    5.  The California bribery statutes are proper
        predicate offenses even under defendant's
        categorical approach ................................................. 57

        a.  The Travel Act broadly criminalizes state
            bribery and easily encompasses the
            California statutes ............................................. 57

# TABLE OF CONTENTS (continued)

**DESCRIPTION**             **PAGE**

     b.     Bribery under the Travel Act is not governed by 18 U.S.C. § 201 ...............................61

D.     The District Court's Evidentiary Rulings Do Not Warrant Reversal.................................................................63

     1.     Factual background ....................................................63

     2.     Standard of review .....................................................66

     3.     The district court did not err in admitting limited evidence of the general pay-to-play scheme ...............67

         a.     Admissibility as direct evidence ........................67

         b.     Rule 403 ...............................................................70

     4.     The district court did not err in sustaining the objection to Huang's hearsay statement .....................71

     5.     Any error was harmless. ..............................................75

VI.     CONCLUSION ................................................................77

# TABLE OF AUTHORITIES

**DESCRIPTION** **PAGE(S)**

## Cases

*Cherry v. Stedman,*
259 F.2d 774 (8th Cir. 1958) ................................................................ 49

*Evans v. United States,*
504 U.S. 255 (1992) ................................................................ 31, 47

*Jackson v. Virginia,*
443 U.S. 307 (1979) ................................................................ 29

*McCormick v. United States,*
500 U.S. 257 (1991) ................................................................ 45

*McDonnell v. United States,*
579 U.S. 550 (2016) ................................................................ passim

*People v. Gaio,*
97 Cal. Rptr. 2d 392 (Ct. App. 2000) ................................................ 59

*Perrin v. United States,*
444 U.S. 37 (1979) ................................................................ passim

*Skilling v. United States,*
561 U.S. 358 (2010) ................................................................ 67

*Taylor v. United States,*
495 U.S. 575 (1990) ................................................................ 56, 57

*United States v. Alexander,*
48 F.3d 1477 (9th Cir. 1995) ................................................................ 66

*United States v. Allen,*
10 F.3d 405 (7th Cir. 1993) ................................................................ 46

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                    **PAGE(S)**

*United States v. Alvarez-Valenzuela,*
   231 F.3d 1198 (9th Cir. 2000) ............................................ 30

*United States v. Boone,*
   628 F.3d 927 (7th Cir. 2010) .............................................. 67

*United States v. Boulware,*
   384 F.3d 794 (9th Cir. 2004) .............................................. 66

*United States v. Brewster,*
   408 U.S. 501 (1972) ........................................................... 47

*United States v. Carpenter,*
   961 F.2d 824 (9th Cir. 1992) .............................................. 49

*United States v. Chi,*
   936 F.3d 888 (9th Cir. 2019) ...................................... passim

*United States v. Collicott,*
   92 F.3d 973 (9th Cir. 1996) ................................................ 74

*United States v. Dimora,*
   750 F.3d 619 (6th Cir. 2014) .............................................. 47

*United States v. Doe,*
   842 F.3d 1117 (9th Cir. 2016) ............................................ 29

*United States v. Dorrell,*
   758 F.2d 427 (9th Cir. 1985) .............................................. 74

*United States v. Espinoza-Baza,*
   647 F.3d 1182 (9th Cir. 2011) ............................................ 66

*United States v. Fernandez,*
   839 F.2d 639 (9th Cir. 1988) .............................................. 72

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**             **PAGE(S)**

*United States v. Ferriero,*
866 F.3d 107 (3d Cir. 2017) ................................................ 62

*United States v. Fontenot,*
14 F.3d 1364 (9th Cir. 1994) ............................................... 73

*United States v. Ganim,*
510 F.3d 134 (2d Cir. 2007) ................................................ 45

*United States v. Garrido,*
713 F.3d 985 (9th Cir. 2013) ................................... 30, 31, 34

*United States v. Goldtooth,*
754 F.3d 763 (9th Cir. 2014) ............................................... 30

*United States v. Gonzalez-Flores,*
418 F.3d 1093 (9th Cir. 2005) ............................................. 66

*United States v. Hankey,*
203 F.3d 1160 (9th Cir. 2000) ............................................. 70

*United States v. Hayat,*
710 F.3d 875 (9th Cir. 2013) ............................................... 74

*United States v. Jinian,*
725 F.3d 954 (9th Cir. 2013) ............................................... 67

*United States v. Kaplan,*
836 F.3d 1199 (9th Cir. 2016) ........................................ 43, 52

*United States v. Kemp,*
500 F.3d 257 (3d Cir. 2007) ........................................... 31, 50

*United States v. Kimbrew,*
944 F.3d 810 (9th Cir. 2019) ............................................... 32

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Liera-Morales,*
759 F.3d 1105 (9th Cir. 2014)................................................74

*United States v. Lindberg,*
39 F.4th 151 (4th Cir. 2022) ........................................ 33, 34

*United States v. Lonich,*
23 F.4th 881 (9th Cir. 2022) ..............................................53

*United States v. Lothian,*
976 F.2d 1257 (9th Cir. 1992) ..........................................69

*United States v. Ma,*
2021 WL 5860893 (9th Cir. Dec. 10, 2021)........................48

*United States v. Marguet-Pillado,*
648 F.3d 1001 (9th Cir. 2011)............................................43

*United States v. McCourt,*
925 F.2d 1229 (9th Cir. 1991)............................................69

*United States v. Mitchell,*
502 F.3d 931 (9th Cir. 2007)..............................................72

*United States v. Nardello,*
393 U.S. 286 (1969).............................................................55

*United States v. Nevils,*
598 F.3d 1158 (9th Cir. 2010) ..........................................30

*United States v. Oreto,*
37 F.3d 739 (1st Cir. 1994) ........................................ 49, 52

*United States v. Ramirez-Jiminez,*
967 F.2d 1321 (9th Cir. 1992)............................................67

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                          **PAGE(S)**

*United States v. Rasco,*
 853 F.2d 501 (7th Cir. 1988) ................................................................ 32

*United States v. Ring,*
 706 F.3d 460 (D.C. Cir. 2013) ................................................ 32, 33, 46

*United States v. Rogers,*
 389 F. Supp. 3d 774 (C.D. Cal. 2019) ................................................ 55

*United States v. Rosen,*
 716 F.3d 691 (2d Cir. 2013) ................................................................ 45

*United States v. Rubio-Villareal,*
 967 F.2d 294 (9th Cir. 1992) .............................................................. 30

*United States v. Rusnak,*
 981 F.3d 697 (9th Cir. 2020) .............................................................. 73

*United States v. Silver,*
 *(Silver I)*, 864 F.3d 102 (2nd Cir. 2017) .......................................... 39

*United States v. Silver,*
 948 F.3d 538 (2d Cir. 2020) ................................................ 33, 39, 48

*United States v. Suhl,*
 885 F.3d 1106 (8th Cir. 2018) ............................................................ 33

*United States v. Sun-Diamond Growers of California,*
 526 U.S. 398 (1999) .................................................................. passim

*United States v. Vallejos,*
 742 F.3d 902 (9th Cir. 2014) .............................................................. 74

*United States v. Vizcarra-Martinez,*
 66 F.3d 1006 (9th Cir. 1995) .............................................................. 68

ix

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                        **PAGE(S)**

*United States v. Wazney,*
   529 F.2d 1287 (9th Cir. 1976) ................................................................ 42

*United States v. Woodward,*
   149 F.3d 46 (1st Cir. 1998) ................................................................ 47

**Statutes**

18 U.S.C. § 201 ................................................................ 30, 60, 61, 62

18 U.S.C. § 201(b)(1)(A) ................................................................ 30

18 U.S.C. § 201(b)(2)(A) ................................................................ 47

18 U.S.C. § 666 ................................................................ 22, 34, 43

18 U.S.C. § 666(a)(2) ................................................................ 34

18 U.S.C. § 666(a)(1)(B) ................................................................ 47

18 U.S.C. § 1343 ................................................................ 22, 32

18 U.S.C. § 1346 ................................................................ 22

18 U.S.C. § 1952 ................................................................ 22, 55, 57, 62

18 U.S.C. § 1956 ................................................................ 55, 61, 62, 63

18 U.S.C. § 3231 ................................................................ 5

28 U.S.C. § 1291 ................................................................ 5

52 U.S.C. § 30121 ................................................................ 46

Ariz. Rev. Stat. § 13-2602(A.1) ................................................................ 60

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

Cal. Penal Code § 7(6) ........................................................59

Cal. Penal Code § 67.5..........................................................59

Cal. Penal Code § 85...................................................... 54, 59

Cal. Penal Code § 165 .................................................... 53, 59

Haw. Rev. Stat. § 710-1040(1)(a) .......................................61

Minn. Stat. § 609.42(1) ........................................................61

N.Y. Penal Law § 200.00 ......................................................61

Tenn. Code § 39-16-102 .......................................................61

Tex. Penal Code § 36.02 .......................................................61

**Rules**

Fed. R. App. P. 4(b)(1)(A)(i) ..................................................6

Fed. R. Evid. 106 ..................................................................74

Fed. R. Evid. 803(3) ...................................................... 72, 73

No. 23-972

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

*v.*

SHEN ZHEN NEW WORLD I, LLC,
*Defendant-Appellant.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT NO. CR 20-00326-JFW-4*

## GOVERNMENT'S ANSWERING BRIEF

## I

## INTRODUCTION

Wei Huang—a foreign national billionaire, career developer, and 100-percent owner of defendant Shen Zhen New World I, LLC—made his first foray into the American commercial real estate market with a singular plan: to redevelop the unremarkable 13-story LA Grand Hotel into a 77-story skyscraper that would be the tallest tower in the western United States. When Huang was introduced to Los Angeles

Councilmember Jose Huizar—a power broker whose votes and formal acts he required for his project—Huang hatched a plan. To secure Huizar's favorable official acts on the hotel redevelopment, Huang pumped the Councilmember with extravagant benefits, ranging from all-expense-paid trips to Las Vegas, hundreds of thousands of dollars in gambling chips, and a disguised $600,000 payment to settle a sexual-harassment lawsuit—an act that saved Huizar's political career and with it, his ability to push approvals of Huang's future redevelopment. Huang made no secret about the reason for these payments; he admitted his plan was to "give, give, give" to secure official acts.

Huang's bribes had their intended effect. Huizar met each of Huang's requests for the hotel with a resounding "yes." And when Huang turned to Huizar with his "big ask" to approve the 77-story tower in Huizar's district, Huizar was enthusiastic to oblige. He not only agreed to give "100% support" but also explained how he could change ordinances and pass rezoning motions so Huang could build "as high as he want[ed]." Huang responded: "very good."

True to his word, Huizar facilitated the project's future approval, including by convening a one-of-a-kind meeting with the heads of other

2

key City departments to tout the forthcoming redevelopment and issuing an official letter with fraudulent representations to help Huang secure financing for his billion-dollar project. But before Huizar could vote, pass motions, and expedite approvals for the redevelopment as Huang expected him to do in exchange for his bribes, the FBI intervened and disrupted Huang's well-laid plans. Huang then fled the country, and he and his company were indicted.

The jury swiftly convicted defendant on all counts. The jury also specifically found five official acts for the redevelopment that defendant "intend[ed] to receive, in exchange for" its benefits, including an official act that Huizar *actually* took—introducing and voting on a formal City resolution honoring Huang.

This Court should affirm. First, the evidence was amply sufficient to support the jury's verdicts. The federal crime of bribery is completed as soon as the bribe payer gives something to the public official with the *intent* to receive some official action—even if the public official does not agree to perform it. The evidence established that, from the beginning, defendant intended to obtain official acts through his bribes on a specific and focused matter—the LA Grand Hotel redevelopment—and

3

not just to build generalized goodwill towards some unknown future need.  And, while not required to do so, the government also proved that Huizar took an official act for the redevelopment and agreed to take future official acts (on Huang's request) because of his bribes.

Second, the district court properly refused to give defendant's legally erroneous and redundant jury instruction on ingratiation, a defense that was never presented at trial.

Third, California bribery statutes are proper predicate offenses for the Travel Act.  Defendant's conduct constituted generic bribery, and the jury specifically found for these counts that Huang provided benefits "in exchange for Jose Huizar agreeing to perform official acts to benefit the redevelopment of the LA Grand Hotel."  Moreover, California law tracks the generic definition of bribery.

Finally, the district court did not abuse its discretion in its evidentiary rulings, and regardless, any error would be harmless.

## II

## ISSUES PRESENTED

A.     Whether sufficient evidence supports defendant's convictions for honest-services fraud, federal program bribery, and Travel Act

4

violations where defendant plied Huizar with extravagant benefits; asked for, and received, support on his redevelopment; and admitted to paying benefits to pave the way for the "big ask" on the project.

B. Whether the district court properly rejected defendant's erroneous and duplicative Instruction No. 35.

C. Whether defendant's Travel Act convictions were proper.

D. Whether the court abused its discretion by (1) admitting limited evidence of the general pay-to-play scheme framework and Huizar's money laundering activities to conceal Huang's bribes and their scheme, and (2) excluding Huang's hearsay statement denying he was part of an unlawful scheme.

# III

# STATEMENT OF THE CASE

## A. Jurisdiction, Timeliness, and Bail Status

The district court's jurisdiction rested on 18 U.S.C. § 3231. This Court's jurisdiction rests on 28 U.S.C. § 1291. The district court entered judgment on May 12, 2023. (1-ER-2-7.)[1] Defendant filed a

---

[1] "ER" refers to defendant's Excerpts of Record, and "SER" refers to the government's Supplemental Excerpts of Record. "AOB" refers to

(continued ...)

timely notice of appeal on May 18, 2023. (14-ER-3173.) *See* Fed. R.

App. P. 4(b)(1)(A)(i). Defendant is an LLC.

## B. Statement of Facts and Procedural History

### 1. *Defendant buys the LA Grand Hotel with the specific plan to redevelop it into the City's tallest skyscraper*

Chairman Wei Huang was a billionaire, foreign national,

developer, and sole owner of the Chinese real estate development

company, Shen Zhen New World Group. (2-ER-299, 5-ER-994-95.)

Emblematic of the company's towering, skyline-transforming

skyscrapers, its slogan was "New World, New Landmark." (2-ER-303;

*see also* 11-ER-2445; SER-4-5.)

In 2010, Huang acquired his first commercial property in the

United States when he paid $63 million for downtown Los Angeles's 13-

story LA Grand Hotel. That property was wholly held by defendant

Shen Zhen New World I, LLC, a subsidiary of Shen Zhen New World

Group. (2-ER-304-05.) From the start, Huang planned to redevelop the

dilapidated hotel into a grand landmark worthy of the Shen Zhen

---

Appellant's Opening Brief and is followed by applicable page numbers.
"CR" refers to the Clerk's Record in the district court and is followed by
the docket number.

brand.  (*See* 2-ER-317; 4-ER-772.)  Ricky Zheng, Huang's right-hand

man and employee (2-ER-301; 5-ER-995-97), testified that it was

Huang's dream to build the tallest tower in Los Angeles (8-ER-1817).

Huang chose to purchase the LA Grand Hotel only after confirming that

"more levels [could] be built on it."  (8-ER-1753-54, 1772.)

Following Huang's acquisition of the LA Grand Hotel and a

Sheraton hotel outside of downtown, Huang announced in a press

release that the purchases "strengthen[ed] our company's investment

strategy on U.S. real estate" and that the Los Angeles real-estate

market had "great potential for development."  He declared that the

properties "fulfilled the company's dream of transnational

development."  (2-ER-312-14.)

### 2. *Huang meets Councilmember Jose Huizar and learns of his influence over the LA Grand Hotel redevelopment project*

Large-scale development projects in Los Angeles required

permissions to build called "entitlements," which must be approved by

the 15-member City Council.  (4-ER-835-837.)  In 2013, Huang met

Councilmember Jose Huizar, who for several reasons was the City's

7

most influential official for issuing entitlements and fast-tracking a development project like the LA Grand Hotel redevelopment.

First, Huizar was the Councilmember for Council District 14 ("CD-14"), which covered the downtown location of the LA Grand Hotel. (2-ER-287, 307.) The other councilmembers deferred to the councilmember in whose district a project sat. So if Huizar approved a project in his district, other councilmembers would follow suit. (4-ER-837-40; 11-ER-2427-2429.) Obtaining Huizar's support was therefore critical to any project in downtown. That was especially true in the mid-2010s, when the City was undergoing an unprecedented commercial real-estate boom and developers were clamoring to meet with Huizar and his staff. (11-ER-2427, 2429-30.)

Second, Huizar chaired the Planning and Land Use Management Committee ("PLUM"). (2-ER-289.) PLUM was the Council committee that heard and voted on entitlements for development projects before making recommendations to the full Council, where Huizar got another vote. (2-ER-289-90; 4-ER-840-41.) As chair, Huizar set the agenda for PLUM and dictated when—and if—it heard a particular project. (2-ER-290.) Without a PLUM hearing, a stalled project faced endless delays,

8

increased costs, and ultimately death. (4-ER-842-43; 5-ER-985; 7-ER-1586.) Huang required at least two major entitlements from PLUM: (1) the Transfer of Floor Area Rights ("TFAR"), which allowed developers to add height to a building beyond its zoning restrictions (4-ER-858-59); and (2) the vesting tentative tract, which permitted a developer to have multiple uses (*e.g.*, hotel, apartments, condominiums) for one building. (4-ER-856.)

Third, Huizar was on the influential Economic Development Committee. (2-ER-291.) That committee approved Transient Occupancy Tax ("TOT") rebates, which provided lucrative financial incentives, sometimes exceeding $100 million, for developers like Huang building large-scale hotels. (4-ER-863-66.)

Huizar was introduced to Huang as the "big boss of downtown," the CD-14 Councilmember, and PLUM chair, all of which meant Huizar had enormous power to expedite and approve large redevelopments. (5-ER-1001-03.) Huang, who spoke limited English and often communicated through Ricky Zheng or other bilingual associates, gave a thumbs up and expressed his approval of Huizar: "very, very good." (5-ER-1003; 2-ER-300.) Thereafter, George Esparza—Huizar's special

9

assistant and right-hand man—frequently reminded Zheng of Huizar's power to "essentially make or break the project." (5-ER-1005; 6-ER-1365.)

Huang got the message. He relayed Huizar's power as the CD-14 Councilmember and PLUM chair to Zheng and other employees, emphasizing that it was "very important" to have Huizar's support (4-ER-737-738; 9-ER-1903) and describing Huizar's ability to expedite, review, and approve the redevelopment (8-ER-1764-65, 1814-15).

### 3. *Huang and Huizar engage in a pay-to-play scheme*

Almost immediately after meeting Huizar, Huang invited him and Esparza on an all-expense-paid trip to Las Vegas. (5-ER-1008-09.) That trip, like the many that followed, included a private jet, a sprawling hotel villa with private pools and luxurious amenities, tens of thousands of dollars in gambling chips, black car and limo services, extravagant food and alcohol, a loyal casino host to accommodate other requests, and prostitutes. (5-ER-1010-12, 1015-22, 1028-29.)

Over the next four years, Huang treated Huizar to 20 trips to Vegas and gave him approximately $250,000 in gambling chips. (3-ER-400-01; 9-ER-2056; SER-26.) On each trip, Huang unabashedly courted

10

Huizar, making sure Huizar knew he was the VIP and guest of honor. Huang gave Huizar first pick of the prostitutes, seated Huizar beside him, gave Huizar the most gambling chips, served him first at the dinner table, let him select the choicest wine, and made sure they rode around town together in a Rolls Royce. (5-ER-1017, 1020-23, 6-ER-1379.)

Huang had a specific purpose for showering Huizar with benefits: they were an investment into Huizar for the future redevelopment. As Huang confided in Zheng, his plan was to "give, give, give" until the time was right to make the "big ask" for Huizar's support on the redevelopment. (5-ER-1097-98, 1115.)

During this same time, Huizar was also running a pay-to-play scheme with other developers in Los Angeles. (5-ER-985-87.) Developers who "paid" benefits to Huizar were permitted to "play": they received full access to Huizar's office for their projects. (5-ER-987-90; 11-ER-2430-31.) Meanwhile, developers who failed to pay got "no play," and their projects indefinitely stalled. (*Id.*) Those who paid were treated as VIPs and referred to as "Friends of the Office." (*Id.*) Huizar's middleman, Esparza, tracked requests from Friends of the

11

Office for Huizar to fulfill, and he relayed Huizar's requests for benefits to developers or their middlemen, *i.e.*, the "[Esparza] of the developer." (5-ER-988-91.)

The same scheme ensued with Huang. Huang's middleman, Zheng, coordinated benefits like the Vegas trips and prostitutes for Huizar and then relayed to Huizar (often through Esparza) Huang's requests for assistance on his hotel. (5-ER-995-97, 1004; 8-ER-1767, 1795-97, 1818-19.) Huang's exorbitant pays quickly made him a Friend of the Office with the green light to play and a "top priority" for Huizar. (5-ER-992, 1005, 1098; 6-ER-1373-74.) All told, Huang provided Huizar with over one million dollars in benefits.[2]

Huang wasted no time asking for Huizar's help on the issue *du jour* affecting the LA Grand Hotel, ranging from supporting the multi-million-dollar renovations (4-ER-738-39), intermediating negotiations for purchasing an adjacent parking lot, resolving union disputes, having a same-day meeting with Huizar (who blew off a Council meeting) (5-

---

[2] This is a conservative estimate based on $259,500 in Vegas gambling chips, $600,000 in settlement money, $30,000 in Australian gambling chips, $10,000 in business class airfare, and 10 percent of the Vegas group benefits. (SER-26-27; 5-ER-1139-44, 1149, 1157.)

ER-1099-1104), issuing a City certificate, and organizing a press conference for the boarding school located in Huang's hotel (5-ER-1136-39). Huang often made his requests en route to Vegas in the private jet or shortly after returning. (5-ER-1098-99.) And Huizar fulfilled each request because of Huang's bribes. (5-ER-1005; 6-ER-1380.)

### 4. *Huang and Huizar conceal their Vegas trips*

To avoid law-enforcement detection, Huang and Huizar tried to conceal their pay-to-play scheme. Esparza was trained "not to directly say, hey, we want this contribution for this vote" but to use other ways to communicate that something was "important to the councilmember," *i.e.*, to solicit a bribe. (5-ER-990-92.)

The concealment extended to their Vegas trips. As a "big whale" and "high-roller," Huang commanded the loyalty and protection of the Vegas casinos, particularly in private VIP rooms. (3-ER-470-71; 5-ER-1019-20, 1028-29, 1052.) Still, with Huang's knowledge, Huizar and Huang's middlemen used fake names for Huizar on the private casino jets. (5-ER-1053-55; 8-ER-1786-89.)

In 2015, security personnel at the Palazzo casino identified and approached Huizar—who had ventured out into the public gaming

area—and requested that he sign a form affirming that he was not gambling with public funds. Huizar refused. After learning about this incident, Huang stopped taking Huizar to Vegas for a "cooling off" period because it was "not safe." (3-ER-381-86; 5-ER-1045-52.) Months later, when Huang resumed taking Huizar, Huang largely avoided the Palazzo, even though he had favored that casino for years. (5-ER-1045, 1050; SER-26.)

### 5. *Huang saves Huizar's political seat by secretly paying a $600,000 bribe to settle a sexual-harassment lawsuit, and Huizar takes an official act for Huang*

Another shared goal of the scheme was to maintain political power. (5-ER-991-92.) Huang did this, in large part, by saving Huizar's CD-14 seat through a concealed $600,000 payment to settle a sexual-harassment lawsuit.

In late 2013, Huizar's political seat became threatened when a former staffer sued him for sexual harassment. (5-ER-1070-71.) The allegations were a major liability for Huizar's 2015 re-election campaign. Huizar turned to Huang for the money he needed to settle the lawsuit and "silence the other side." (4-ER-740-41; 5-ER-1071-74.)

14

Huang provided the hush money. Despite Huang's easy access to ample funds (he could lose $2.1 million in one Vegas trip (10-ER-2279-80)), Huang and Huizar agreed to conceal Huang and defendant as the source of the funds. (4-ER-802; 5-ER-1074-77, 1089; 6-ER-1385-87.) To keep the arrangement "discreet and confidential" (6-ER-1385-87), Huang funneled the $600,000 payment through a foreign shell company called Grace Luck Holdings and directed a loyal Shen Zhen employee, accounting clerk Yan Yan, to act as its ostensible representative. (5-ER-1080-81, 1085-87; 6-ER-1277, 1394; 8-ER-1804-06.) Huang kept Yan Yan clueless: she had no idea what Grace Luck Holdings was or that she was its "sole representative" in the United States; she did not know who Huizar was; and she did not know the nature or purpose of the bank transaction she approved. (6-ER-1407-08, 1413-15, 1420; 7-ER-1450-51; 1453-55.) Years later, Huang told Yan Yan he was replacing her on the bank paperwork with his daughter's name. (7-ER-1467-68.)

To add another layer of concealment, Huang used a disbarred attorney, Henry Yong (10-ER-2117-20), to create purported corporate documents for Grace Luck Holdings (9-ER-2079-80) under the guise of

attorney-client privilege (5-ER-1083; 6-ER-1267-68, 1385-87).  The $600,000 was wired from Grace Luck Holdings to an Interest on Lawyers' Trust Account before it was transferred to East West Bank in Pasadena as the collateral for a private loan to Huizar, which he used to confidentially settle the lawsuit.  (3-ER-453-58; SER-27.)  Huizar made minimal interest-only payments on this loan, including by laundering cash he received from Huang (8-ER-1731-32; 9-ER-2062-66; SER-28-36); after the FBI investigation went public and the bank seized the collateral (7-ER-1543), Huizar never paid Huang back the $600,000 loan.  (9-ER-2081-83.)

While discussions with Huang about the settlement money were ongoing, Huizar performed an official act for Huang.  (3-ER-445-47; SER-40-43.)  In a formal City Council proceeding in 2014, Huizar moved and voted for a resolution honoring Huang's achievements and thanking him "for the contributions he has and will continue to make to [the] economy of the Fourteenth District."  (3-ER-445-447; 4-ER-675-76; SER-21-22.)  The resolution was seconded by "all council."  (4-ER-681.)

Huang and Huizar's plan to maintain Huizar's political power worked.  Huizar was re-elected to the CD-14 seat, and he and Huang

jetted off to Vegas in celebration. (5-ER-1094; SER-40-43.) In a villa, Huizar thanked Huang for saving his career with the settlement money. (5-ER-1094-96.) In response, Huang joked that $600,000 was "the most expensive pussy he paid for." (*Id.*; 9-ER-1910-11.)

### 6. *Huang asks Huizar to support the redevelopment, and Huizar agrees because of Huang's bribes*

Huang continued getting what he paid for. Following the settlement, Huizar doubled down on ensuring Huang was a "top priority" and "deliver[ing]" on all his requests. (5-ER-1098.) And Huang soon revealed his "big ask" and his long-held plans for the billion-dollar project converting the LA Grand Hotel into a 77-story mixed-use tower and the tallest building west of the Mississippi. (5-ER-919, 1097-98; 11-ER-2420, 2436; *see also* SER-8-20.)

In 2015, Huang began exploring in earnest the specific TFAR he needed to build on top of the LA Grand Hotel. (3-ER-459-60.) In 2016, Huang had a flurry of meetings and communications with architects, a real estate firm, and consultants regarding the redevelopment. (7-ER-1667-69; 9-ER-2083-96; SER-37.) Certain he would quickly obtain approvals for the redevelopment, he commissioned a market study in 2016 to make income projections on the new hotel and condominiums

17

and represented that the project would be fully built by 2020 or 2021. (7-ER-1670-71, 1680, 1684.)

It was time for the big ask. During a cigarette break at his Sheraton, Huang asked for Huizar's support on his towering redevelopment project, stating that it would be his "big dick" over the City. (5-ER-1113-15.) A delighted Huizar agreed to support the project. (*Id.*) The project became a repeat topic of discussion, with Huizar pledging his support every time. Huang told Huizar that the redevelopment was his "biggest priority," "the largest project west of the Mississippi," and his "landmark in the city." He said that it was his dream to build the tallest tower in Los Angeles. (5-ER-1111-13; 8-ER-1816-17.) In response, Huizar committed to give Huang "100 percent support" for the project and explained what he could do as the PLUM chair:

> [A]s far as floors, [the chairman] could go as high as he wants. If there's certain ordinances that need to be changed or any motions that need to be addressed or passed or… rezoning of the project, that the councilmember as the chair of PLUM could make that happen.

(5-ER-1112-13.) Pleased, Huang responded: "Very good." (*Id.*)

18

### 7. *Huizar delivers on Huang's requests*

As promised, Huizar gave his full support for Huang's
redevelopment. Upon Huang's request (8-ER-1816), Huizar organized a
meeting on August 4, 2016, between his council office, Huang and his
project team, and the heads of two other key City departments
responsible for approving major redevelopments. (4-ER-867-68; 9-ER-
2069.) With Huizar's support, Huang's team presented its plan to
redevelop the LA Grand Hotel, and the group discussed TFAR, TOT,
and other incentives. (4-ER-871; 5-ER-1108-10; 11-ER-2420.) A 23-
year veteran with the Planning Department testified that this was the
only meeting he had ever attended with the Councilmember, the
Deputy Mayor, and the head of his office to discuss a forthcoming
project with the project team. (4-ER-831, 872-73; 5-ER-967-68.) Huang
received this rare meeting as Huizar's VIP and Friend of the Office. (5-
ER-1107-08.)

Huizar delivered on Huang's other requests too. Huang asked for
an official letter that he needed to finance the billion-dollar project. The
letter touted the redevelopment and the Huizar-hosted August 4
meeting. (5-ER-1128-33.) The draft letter provided by Huang was filled

with misrepresentations, including a civic hearing that never occurred and fake threats that the project application was at risk of being forfeited, even though it had yet to be filed. (2-ER-315; 5-ER-1128-36; SER-6-7.) Huizar signed off anyway. (*Id.*) When Huang asked for a land-use consultant, Huizar steered him to the one Huang ultimately hired and away from one who was not "loyal enough" to Huizar. (5-ER-1124-27; 2-ER-317-18.)

Meanwhile, Huang continued to give. In early 2016, Huang took Huizar on a luxury trip to Australia with business-class airfare worth over $10,000 and gambling chips worth over 30,000 Australian dollars. (5-ER-1139-44, 1149, 1157.) They took seven Vegas trips in 2016, including one the day after the one-of-its-kind August 4 meeting (5-ER-1117), and two trips in 2017. (SER-37-38.)

### 8. *The FBI closes in, Huang flees, and defendant is indicted*

In February 2017, Huang learned from a Vegas hostess that the FBI was looking into him and Huizar. (6-ER-1188.) Concerned, Huang

20

instructed Zheng there would be no more trips to Vegas with Huizar.[3] (*Id.*; 8-ER-1824-25.)

Around this same time, Huang also learned that Huizar was involved in another sexual affair, which Huang lamented was "no good" for his redevelopment. (6-ER-1189.) Huang bemoaned that he had "all his eggs in one basket" with Huizar. (6-ER-1191.) So he made back-up plans and sought to influence a different councilmember, Mitch Englander, by taking him to Vegas. (6-ER-1190-91.) At Huizar's request, Huang also supported the 2020 election of Huizar's wife, Richelle, to the CD-14 seat whom Huizar had pressured to succeed him so he could maintain power after his final term. (6-ER-1183-84, 1186-87; 9-ER-2009-10, 2014-15.)

Huang's contingency plans came up short. In November 2018, a few months after defendant filed the redevelopment application, the FBI executed search warrants at Huizar's office and residence. (3-ER-494-95.) In the days that followed, the FBI spoke to Huang at his LA home and told him about the investigation into Huizar. (3-ER-503-05.)

---

[3] Huang still took Huizar to an exclusive golf resort, Pebble Beach, in August 2018 in a $20,000 privately chartered jet. (3-ER-486-88.)

The FBI also interviewed Zheng and seized his digital devices pursuant to a warrant. (*Id.*) When Zheng told Huang about the warrant, Huang became alarmed that the FBI "may find him." (8-ER-1827-28.) The next day, Huang fled to China. (3-ER-505-508; 8-ER-1828-29.) He has not returned.

In November 2020, Huang and defendant were indicted on (1) three counts of honest-services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346; (2) one count of federal program bribery, in violation of 18 U.S.C. § 666; and (3) four counts of interstate and foreign travel in aid of racketeering, in violation of the Travel Act, 18 U.S.C. § 1952(a)(3). (13-ER-3033-3170.)

### 9. *Defendant is convicted*

#### a. *The government and defense cases*

At trial, the government established the facts described above. The government elicited limited testimony from Esparza about the RICO conspiracy to which he pled guilty as part of his cooperation plea agreement and the pay-to-play scheme between defendant and Huizar.

Defendant's strategy was not to argue that Huang engaged only in lawful lobbying; instead, it denied that Huang's benefits had *anything*

22

to do with Huizar's status as a public official. Through cross-examination of the government's witnesses, defendant repeatedly emphasized that Huang had a genuine friendship with Huizar and suggested *that* was the reason for his financial benefits to the Councilmember. (3-ER-530 ("And Mr. Huizar was a friend of Wei Huang's, correct?"); 4-ER-788 ("And you understood as well that Mr. Huang was a friend of Jose Huizar's; correct?"); *accord* 6-ER-1218-19; 8-ER-1849; 9-ER-1903-04.) Even after Esparza testified that Huizar saw Huang as a "fat cow that he can milk" for bribes, the defense insisted that *Huang* still considered Huizar a "close friend," even a "best friend." (6-ER-1256-58; *see also* 11-ER-2550.)

This theme continued in closing. Defendant denied that Huang sought to lobby a public official and rejected the claim that Huang invited Huizar to Vegas "just because he was a councilman." (11-ER-2558.) It argued that "[t]he person's job didn't matter" to Huang and that Huang and Huizar were "genuine" friends who shared a love of wine, gambling, and women. (11-ER-2553, 2558.) Defendant argued that Huang gave the $600,000 settlement money as a "personal favor" because Huizar was "like [a] brother." (*Id.*)

23

Defendant also argued that Huang had "no need to bribe anybody" because "the project [was] universally loved" and "green-lit from the start." (2-ER-270, 278.) Defendant drew out this same theme in cross-examination. (*E.g.*, 5-ER-923, 975 ("The project sells itself; right?"); 7-ER-1630.) In closing, defendant argued that the redevelopment project was supported by "those seeking to bring economic development into Los Angeles County," and because the project was "universally supported," there was "no need and no reason to corrupt this project." (11-ER-2527.)

### b.   *The jury instructions*

For the honest-services wire fraud counts, the court instructed the jury that the government must prove defendant's scheme or plan "consisted of financial benefits that defendant provided intending, at the time, to receive in exchange at least one official act by Jose Huizar in connection with the approval of the redevelopment of the L.A. Grand Hotel." (1-ER-48.) It instructed that "[t]he 'exchange' may be express or may be implied from all the surrounding circumstances." (*Id.*)

The court also gave the definition of an official act from *McDonnell v. United States*, 579 U.S. 550 (2016): "any decision or action" on a

"specific and focused" matter involving "the formal exercise of governmental power." The court clarified that "[m]erely arranging a meeting, hosting an event, or giving a speech do not qualify as the taking of a specific action." (1-ER-50.)

For federal program bribery, the jury was instructed that the government must prove that defendant "acted corruptly" by giving "a thing of value" and "intended to influence" Huizar in connection with the redevelopment, including in (1) "presenting motions"; (2) "voting," including in the PLUM Committee and City Council; (3) "taking action in the PLUM committee to expedite the approval process"; or (4) "exerting pressure on other City officials to influence the approval process." (1-ER-56-57.) Defendant stipulated to this instruction. (*See* 11-ER-2400; SER-114-16.)

On the Travel Act counts, the jury was instructed that the government must prove the charged act whereby "the defendant, acting through its agent, Wei Huang, provided [benefits], in exchange for Jose Huizar agreeing to perform official acts to benefit the redevelopment of the L.A. Grand Hotel." (1-ER-53-54.)

The district court declined to give defendant's proposed Instruction No. 35. (*See* 1-ER-171-72.) That instruction stated that "[a]ll counts" required "a direct exchange of money or other financial benefit for an official act"; that the exchange must be "clear and unambiguous, leaving no uncertainty about the terms of the bargain"; and that the government needed to prove a specific intent that the benefit "was in exchange for Councilman Huizar's agreement to take one or more of the specified official acts to benefit the LA Grand Hotel project." (*Id.*) The court explained the instruction "misleadingly suggest[ed]" that the defendant must intend to receive *specific* actions on matters, that an actual exchange must occur, and that the public official must agree to take the act. (11-ER-2400.)

### c. *The verdicts*

Following the 10-day presentation of evidence, the jury convicted defendant on all counts in just over four hours using a special verdict form. (1-ER-15-27; *see* 11-ER-2619; CR-810.)

Across the three honest-services fraud counts (Counts Two to Four), the jury found five official acts defendant "intend[ed] to receive [from Huizar], in exchange for those financial benefits[.]" (1-ER-17, 20,

22.)  Those official acts were: "presenting motions and resolutions in various City [ ] committees"; "voting"; "taking action in the PLUM committee to expedite the approval process"; "exerting pressure on other City officials to influence the approval process; and "introducing or voting on City resolutions to enhance [defendant's] professional reputation and marketability"—all to benefit the redevelopment of the LA Grand Hotel.  (*Id.*)

# IV

## SUMMARY OF ARGUMENT

The Court should affirm defendant's convictions.

First, overwhelming evidence supports the verdicts.  To convict defendant of honest-services fraud, the jury needed to find that defendant gave the benefit with the intent to receive an official act on a specific matter.  Contrary to defendant's contention, it did not need to find that Huizar agreed to perform or performed any official act.

Nevertheless, the evidence showed that Huang had a specific motive and intent to redevelop the LA Grand Hotel; knew Huizar had the most power to approve that project; paid exorbitant bribes to Huizar (including one that saved his political seat); concealed those bribes;

expressly asked Huizar to support the redevelopment; received Huizar's agreement of support; received Huizar's assistance on matters relating to the hotel and the project, including an official Council resolution; admitted planning all along to "give, give, give" until he revealed his "big ask" for the redevelopment; and ultimately fled from prosecution. This evidence was more than ample for the jury to convict, including on the federal-program bribery and Travel Act counts for which the government voluntarily assumed a higher burden akin to that required for honest-services fraud.

Second, the district court properly refused to give defendant's Instruction No. 35. Defendant's instruction misstated the law, and the court's instructions on the official-act and intent requirements ensured that the jury did not convict defendant based on mere ingratiation. Moreover, defendant never argued that Huang's actions amounted to ingratiation, and the evidence left no doubt about defendant's guilt.

Third, defendant's challenge to the Travel Act counts fails because the government elevated its burden and required the jury to find that Huang intended to receive an official act through his benefits, in violation of California bribery law. But in any event, the general

28

California statutes comfortably fall within the ambit of conduct prohibited by the Travel Act.

Finally, the district court did not abuse its discretion in admitting limited evidence of the general pay-to-play scheme and Huizar's money-laundering activity to conceal Huang's bribes. Nor did it abuse its discretion in excluding Huang's self-serving hearsay statement. Regardless, any error in admitting this evidence was harmless because the record plainly establishes defendant's guilt.

## V

## ARGUMENT

### A. Sufficient Evidence Supports the Jury's Guilty Verdicts

#### 1. *Standard of review*

The Court reviews the sufficiency of evidence de novo. *United States v. Doe*, 842 F.3d 1117, 1119 (9th Cir. 2016). Sufficient evidence exists if "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[A]ll reasonable inferences are to be drawn in favor of the government, and any conflicts in the evidence are to be

resolved in favor of the jury's verdict." *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1201-02 (9th Cir. 2000).

"The standard of review employed in sufficiency of the evidence cases is highly deferential." *United States v. Rubio-Villareal*, 967 F.2d 294, 296 (9th Cir. 1992) (en banc). This Court "may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc). Accordingly, evidence is insufficient only on "rare occasions." *United States v. Goldtooth*, 754 F.3d 763, 768 (9th Cir. 2014).

### 2. *A defendant commits honest-services fraud based on bribery by giving a benefit with intent to receive an official act, even if the official neither performs nor agrees to perform that act.*

Honest-services fraud based on a bribery theory requires proof of intent to enter a quid pro quo. *See United States v. Garrido*, 713 F.3d 985, 996-97 (9th Cir. 2013); *see also McDonnell*, 579 U.S. at 562, 572-75 (analyzing quid-pro-quo requirement with reference to § 201). When the defendant is the briber, this requirement is "intent to influence any official act," 18 U.S.C. § 201(b)(1)(A), or put differently, the "specific intent to give something of value in exchange for an official act." *United*

30

*States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404 (1999) (cleaned up); *Garrido*, 713 F.3d at 996-97 (same). This specific intent element differentiates gifts to "curry favor or build goodwill" from illegal bribery. *United States v. Kemp*, 500 F.3d 257, 281 (3d Cir. 2007).

The necessary intent can be implied; that is, the briber "need not state the quid pro quo in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods." *Evans v. United States*, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring); *see Garrido*, 713 F.3d at 996-97; *accord McDonnell*, 579 U.S. at 572 (agreement by a public official "need not be explicit"). Nor must the briber "specify the means" that the official "will use to perform his end of the bargain." *McDonnell*, 579 U.S. at 572. It is enough that the government show a "connection" between the defendant's "intent and a specific official act." *Sun-Diamond*, 526 U.S. at 405.

This intent requirement for a *briber* differs from the requirement for a *bribee* public official. An official is guilty of bribery if he agrees to perform an official act and "receive[s] a thing of value knowing that it was given with the expectation that the official would perform an 'official act' in return," *McDonnell*, 579 U.S. at 572. Even then, the

official need not have "genuine intentions to follow through." *United States v. Kimbrew*, 944 F.3d 810, 815 (9th Cir. 2019).

By contrast, a briber's crime is offering the benefit with the "intent to influence" an official act itself. *Sun-Diamond*, 526 U.S. at 404. So a briber is guilty of honest-services fraud "where he offers an official something of value with a specific intent to effect a quid pro quo even if that official emphatically refuses to accept." *United States v. Ring*, 706 F.3d 460, 467 (D.C. Cir. 2013). The government does not need to prove that the public official who received the bribe either took or agreed to take official action. This intent requirement for bribers makes sense because honest-services fraud "punishes the scheme, not its success." *Id.*; *see also* 18 U.S.C. § 1343 (punishing "scheme or artifice to defraud"). It is irrelevant whether "the official [ ] agree[d] to or actually complete[d] a corrupt exchange." *Ring*, 706 F.3d at 467 (cleaned up); *cf. United States v. Rasco*, 853 F.2d 501, 505 (7th Cir. 1988) ("The crime of offering a bribe is completed when a defendant expresses an ability and a desire to pay the bribe.").

This intent requirement raises "no constitutional concerns and practical concerns," (AOB-20-21), and courts have routinely affirmed

that the culpable intent of the defendant-payor is what matters in honest-services fraud, federal program bribery, and Travel Act cases. *E.g.*, *United States v. Silver (Silver II)*, 948 F.3d 538, 551-52 (2d Cir. 2020) (honest-services fraud does not require a "meeting of the minds between the payor and the official as to the corrupt purpose of the payments"); *United States v. Suhl*, 885 F.3d 1106, 1113 (8th Cir. 2018) (payor-defendant completes honest-services bribery crime "as soon as he gives or offers payment in exchange for an official act, even if the payee does nothing or immediately turns him in to law enforcement."); *see also Perrin v. United States*, 444 U.S. 37, 50 (1979) (affirming Travel Act conviction for promoting commercial bribery scheme); *United States v. Lindberg*, 39 F.4th 151, 172 (4th Cir. 2022) (section 666 criminalizes paying bribes where defendant "intended for the official to engage in some specific act" in return for the payment).

Here, the district court's honest-services fraud instructions correctly required the jury to find that defendant provided benefits "intending, at the time, to receive in exchange at least one official act by Jose Huizar in connection with the approval of the redevelopment of the L.A. Grand Hotel." (1-ER-48.) The court also correctly instructed the

33

jury on the "official act" definition. Defendant does not dispute that the official acts listed in the verdict form involve the requisite formal exercise of governmental power on a specific and focused matter that may be brought before Huizar. And even though the Travel Act and federal program bribery statutes require neither a quid pro quo nor an official act, the government elected to assume the higher burden of proving those elements in this case.[4] (1-ER-53-54, 56-57.) So if the evidence showed that Huang gave a benefit intending to receive or influence any official act listed in the verdict form in connection with the honest-services fraud counts, the evidence is sufficient for the federal program bribery and Travel Act counts too.

---

[4] *See* 18 U.S.C. § 666(a)(2) (proscribing corruptly giving benefit "with intent to influence *or reward*"); *Garrido*, 713 F.3d at 996 ("[Section] 666 does not require a jury to find a specific quid pro quo"; collecting cases); *Lindberg*, 39 F.4th at 166-69 (no official act requirement in § 666; collecting cases); *Perrin*, 444 U.S. at 39 (Travel Act encompasses state commercial bribery for bribes to private individuals). Accordingly, whether these statutes generally require quid-pro-quo intent or an official act is not at issue for this panel.

### 3. A rational trier of fact could easily find defendant committed the charged crimes

Taking the evidence in the light most favorable to the government, and resolving any conflicts in favor of guilt, the jury had more than sufficient evidence that defendant provided benefits intending to receive an official act from Huizar for the redevelopment project.

### a. Huang's statements and actions

First, a reasonable jury would have relied on Huang's own words and actions in finding that he gave benefits intending to receive official acts on the redevelopment. Huang repeatedly voiced this intent. It was his dream to redevelop the hotel (5-ER-1111-13; 8-ER-1816-17); indeed, that was the very reason he purchased the LA Grand Hotel in the first place (2-ER-313-14; 8-ER-1753-54). Huang knew that Huizar was the most influential public official for achieving his dream since Huizar controlled PLUM hearings and votes on key entitlements. (4-ER-854-856, 858-859; 5-ER-1112-13.) Thus, Huang confided in his right-hand man that he saw Huizar as an "investment," and that he planned to "give, give, give" until he made the "big ask" for this specific matter. (5-ER-1097.) Huang began showering Huizar with financial benefits soon

after they met and ensured the longevity of his "investment" by paying $600,000 to settle Huizar's sexual-harassment suit.

Huang's statements and conduct were far from generalized lobbying. Huang may have held off on *revealing* to Huizar the specific object behind his "give, give, give," but *Huang* knew he was paying to receive official acts for the redevelopment. He was simply waiting until the timing was right (and Huizar sufficiently primed) before making his objects known. The significance of Huang's damning admission is evidenced in defendant's own strategy at trial: instead of embracing the statement as one of lawful ingratiation, defendant sought to impeach Esparza on this score (*see* 6-ER-1347-49) and conceded in closing that this was "[p]retty damning testimony" (11-ER-2541). Nothing in the law shields defendant from a conviction because Huang did not contemporaneously voice his requests at the exact moment he paid his bribes. It suffices that there was a link at the time of payment between Huang's intent and future official acts on a specific matter. *Sun-Diamond*, 526 U.S. at 405.

Once Huizar was primed, Huang made his intent known by explicitly asking Huizar to support the 77-story redevelopment. (5-ER-

36

1114-15 (Q: "And was he asking for Jose Huizar's support [on the redevelopment]?" A: "Yes."; Q: "Was this the biggest ask that Chairman Huang had made to Jose Huizar?" A: "Yes. This was the big ask.").) In response, Huizar *agreed* to Huang's ask, repeatedly pledged "100 percent" support and said he could ensure the redevelopment was approved by taking official acts like passing motions and ordinances to rezone the project—all of which was met with Huang's satisfaction. (5-ER-1112-16.) Huang's request came after he had lavished extensive financial benefits on Huizar, and he continued providing benefits after making his request and securing Huizar's commitment to the project.

Combined with Huang's stated plan to "give" leading up to his "big ask," Huang's request for official acts on the redevelopment and Huizar's agreement to take them (despite defendant's revisionist retelling to the contrary) demonstrate that Huang gave his gifts intending at the time to receive official acts on the redevelopment. It is immaterial that Huizar, not Huang, defined what he would do to help, since bribery can occur even if neither party "specif[ies] the means" for the official act. *McDonnell*, 579 U.S. at 572.

37

The timing of Huang's requests—often en route to Vegas in the private jet or shortly after returning—also shows his intent.  (*See* 5-ER-1005, 1098-99, 1380.)  Even if these requests were not explicitly for official acts, they show that Huang expected to get something in exchange for giving benefits.

### b.    *Huizar's conduct after receiving benefits*

Second, a reasonable jury would have found evidence of Huang's intent in Huizar's subsequent conduct, which showed that Huizar understood Huang expected official acts because he paid benefits.

For example, while waiting for Huang's $600,000 for the settlement, Huizar moved and voted for a City resolution honoring Huang in a formal Council proceeding presided over by the Council President.  (2-ER-445-447; 4-ER-675-76, 681; SER-21-22.)  Moving and voting for an official resolution is a formal exercise of governmental power and "indisputably an official act" post-*McDonnell*—and one that Huang actually received despite defendant's claim to the contrary. [5]

---

[5] Defendant incorrectly characterizes the resolution as "commendatory."  (AOB-24.)  While *Zheng* received a commendatory certificate that was neither moved nor voted on by City Council (*see* 3-ER-448-49), Huang's resolution required both.

*Silver II*, 948 F.3d at 570; *United States v. Silver (Silver I)*, 864 F.3d 102, 121 (2nd Cir. 2017) (same).

Huang, a foreign developer, entered the competitive Los Angeles commercial real estate market with an ambitious plan, even though it was unusual and surprising for an unfamiliar newcomer to handle "a project[ ] of this scale." (4-ER-868-69.) The resolution praising Huang and highlighting his business acumen, passed alongside other formal resolutions honoring significant causes and individuals, conferred an air of legitimacy on Huang and defendant. (4-ER-677-80.) It bolstered Huang's reputation with the same Council that would later vote on his redevelopment. (4-ER-681.) Evincing the value Huang perceived in City resolutions, he later asked Huizar for just the *commendatory* (non-formal) certificate for his boarding school at the LA Grand Hotel. (5-ER-1136-39.) The jury reasonably found that defendant intended to receive official acts because of his bribes, including "Huizar introducing or voting on City resolutions to enhance [defendant's] professional reputation and marketability" to benefit the redevelopment. (1-ER-17.)

Huizar also gave Huang access unlike that of "an ordinary constituent to an ordinary councilmember" because of his bribes. (6-ER-

1382.) At Huang's request, Huizar convened the August 4 meeting with the heads of three City bodies responsible for approving the project, signaling Huizar's support for the project in his district. Also significant was the financing letter Huang needed, which Huizar issued with numerous false representations. While these are not official acts, they are highly probative of defendant's culpable intent to receive future official acts from Huizar. *See McDonnell*, 579 U.S. at 573 (explaining that "setting up a meeting, hosting an event, or making a phone call" are not always innocent or irrelevant acts because they can "serve as evidence of an agreement to take an official act.").

### c. *Huang's concealment efforts*

Third, a reasonable jury would have inferred Huang's intent based on his efforts to conceal his financial benefits. Huang passed Huizar gambling chips in the safety of protected VIP rooms in casinos loyal to their big whales; his right-hand man facilitated Huizar's trips on private jets with fake names with Huang's knowledge; and when Huang's favored Vegas casino put the spotlight on Huizar, he "cooled off" on their trips and then steered clear of the danger by moving the posse elsewhere. In his most sophisticated concealment plan, Huang

40

secretly routed $600,000 to Huizar using a shell company, a straw employee he hand-selected, and a disbarred lawyer. Huang thereby concealed his connection to Huizar and that he was the one to remove the biggest threat to Huizar's re-election.

These extraordinary and clandestine actions are beyond what typical constituents do to generate goodwill. Unlike a steak dinner or a sports jersey, Huang's concealed bribes worth over a million dollars were commensurate with what a developer who corruptly sought approval of a billion-dollar project would gladly pay. Accordingly, a reasonable jury would conclude that Huang concealed these gifts precisely because he knew that he was bribing Huizar.

### d. Huang's flight

Finally, a reasonable jury would have relied on Huang's flight as evidence of his criminal intent. Huang knew of the FBI investigation into Huizar; he expressed alarm that "the FBI may find him"; and just one day after Zheng warned Huang about the FBI, Huang fled to China and never returned, reflecting a significant departure from his regular pattern of coming to the United States (where he maintained a home)

41

for at least a month at a time. (3-ER-503-508; 8-ER-1827-29.) These facts were highly probative of Huang's consciousness of guilt.

The jury was also permitted to infer that Huang intended to avoid arrest and prosecution by not submitting to the pending arrest warrant once the indictment was returned in 2020. (*See* 3-ER-505-08); *Cf. United States v. Wazney*, 529 F.2d 1287, 1289 (9th Cir. 1976) (knowledge by defendant "that he was wanted by the police, coupled with his failure to submit to arrest, is enough to establish the requisite specific intent to avoid arrest or prosecution."). If Huang believed his conduct was lawful lobbying or ingratiation, why flee? That is a question the jury was permitted to consider and that has an obvious and rational answer: because Huang knew he was guilty.

\*\*\*

Taking the totality of the evidence in the light most favorable to the government and making all reasonable inferences in support of the verdicts, ample evidence shows defendant gave benefits intending to receive an official act, which is all the law requires. In fact, the evidence is sufficient even under defendant's incorrect view that the law requires an official's agreement to take an official act, since Huizar both

42

agreed to take official acts and (5-ER-1112-16) and did take an official

act (4-ER-675-76).

This evidence, which firmly supports defendant's honest-services

fraud convictions, is also beyond sufficient for the Travel Act and § 666

counts, for which the government adopted the same quid-pro-quo and

official-act burden. The convictions should be affirmed.

## B. The District Court's Jury Instructions Were Proper

### 1. *Standard of review*

Although "[a] criminal defendant has a constitutional right to

have the jury instructed according to his theory of the case," the

requested instruction must be "supported by law" and have "some

foundation in the evidence." *United States v. Marguet-Pillado*, 648 F.3d

1001, 1006 (9th Cir. 2011) (citations omitted). "Whether an instruction

'is supported by law' is reviewed *de novo*." *Id.* "Whether it 'has some

foundation in the evidence' is reviewed for an abuse of discretion." *Id.*

"A defendant is not entitled to any particular form of instruction,

nor is he entitled to an instruction that merely duplicates what the jury

has already been told." *United States v. Kaplan*, 836 F.3d 1199, 1215

(9th Cir. 2016). "A judge need not include proposed instructions that

are 'not necessary to explain to the jury the legal effect of the theory of the defense.'" *Id.*

## 2. The district court did not err in refusing defendant's incorrect and duplicative instruction

Although defendant does not challenge the jury instructions on honest-services fraud, the Travel Act, or federal-program bribery (or identify what language therein should have been used instead), defendant argues it was error for the district court to decline to give Instruction No. 35. (AOB-29; 1-ER-171-72.) The district court correctly rejected that instruction, which required the jury to find that Huang provided gifts "in exchange for Councilman Huizar's agreement to take one or more of the specified official acts to benefit the LA Grand Hotel" and instructed on ingratiation. (1-ER-171-72.) That instruction misstated the law, was duplicative of other instructions, and lacked foundation in the evidence.

### a. Defendant's instruction erroneously required an actual agreement or exchange

First, defendant's instruction that the jury find "Councilman Huizar's *agreement* to take one or more of the specified official acts" was wrong as a matter of law, despite defendant's insistence otherwise. (*See*

44

AOB-1, 2, 18, 22, 26, 28 (suggesting that briber can be convicted only if official agrees to take official act).) As explained in Section V.A.2, when the defendant is the briber, the offense does not require an *agreement* by the public official to perform an official act.

The cases defendant cites are inapplicable because they concern campaign contributions or a defendant-public official (the bribee). Because of the unique First Amendment concerns that are present when an alleged bribe consists of campaign contributions, courts have held in the extortion context that the government must prove that defendant-public officials received the contribution "in return for an *explicit* promise or undertaking" to perform an official act. *McCormick v. United States*, 500 U.S. 257, 273 (1991) (emphasis added); *United States v. Ganim*, 510 F.3d 134, 142 (2d Cir. 2007) ("[P]roof of an express promise is necessary when the payments are made in the form of campaign contributions."). But "[o]utside the unique context of campaign contributions, [courts] have not, in the context of bribery cases, required proof of an express promise regarding the specific official acts to be undertaken as part of the exchange." *United States v. Rosen*, 716 F.3d 691, 701 (2d Cir. 2013), *abrogated on other grounds by*

*McDonnell v. United States*, 579 U.S. 550 (2016); *see United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993).

The higher *McCormick* standard in campaign-contribution cases exists for good reason. "[W]hereas soliciting campaign contributions may be practically unavoidable so long as election campaigns are financed by private expenditures, accepting free dinners is certainly not." *Ring*, 706 F.3d at 466. Thus, "the First Amendment interest in giving hockey tickets to public officials is, at least compared to the interest in contributing to political campaigns, de minimis." *Id.*

These cases, and any attendant First Amendment concerns, are inapplicable here. First, this case does not involve campaign contributions. In fact, Huang, a foreign national, was prohibited from directly or indirectly making any campaign contributions, *see* 52 U.S.C. § 30121, and the alleged bribes were not political contributions. These facts also distinguish *Buckley v. Valeo*, *Citizens United*, *McConnell v. FEC*, *McCutcheon v. FEC,* and *FEC v. Cruz*, which are all civil cases addressing limits on campaign contributions and other campaign finance and expenditure laws, not criminal bribery law. (AOB-18-21, 27, 29.)

Second, defendant was not a public official. The other cases on which defendant relies to suggest the government must prove an *agreement* involve defendants who were the public official-bribees. *See, e.g., Evans*, 504 U.S. at 257 (defendant was member of Board of Commissioners); *United States v. Brewster*, 408 U.S. 501, 502 (1972) (Member of Congress); *United States v. Woodward,* 149 F.3d 46, 51 (1st Cir. 1998) (state representative); *United States v. Dimora*, 750 F.3d 619, 623 (6th Cir. 2014) (two county officials). As discussed in Section V.A.2, the requirements for bribers and public officials differs. For defendant-public officials, the requisite criminal act encompasses agreeing to perform an official act. 18 U.S.C. § 201(b)(2)(A); *McDonnell*, 579 U.S. at 572; *accord* 18 U.S.C. § 666(a)(1)(B) (criminalizes conduct by public official corruptly "agree[ing] to accept" bribe). But as defendant tersely acknowledges, a briber can be guilty so long as he "intend[s] the gifts to be part of an agreement," even if the official rejects the offer. (AOB-29.) That concession sinks defendant's argument.

Nor was Instruction No. 35 appropriate because "the Government's theory" was that Huang and Huizar "formed an implicit agreement." (*Id.*) While the evidence at trial certainly established that

47

Huang and Huizar had such an agreement, nothing in the law requires the government to prove an additional element simply because the strength of the evidence permitted it to overprove its case.

Because the instruction erroneously required the jury to find an agreement by Huizar, the court correctly rejected it.

### b. Defendant's instruction erroneously required an express exchange and the identification of specific official acts

Other errors tainted defendant's Instruction No. 35. The instruction incorrectly suggested defendant must intend to receive "specified official acts." (1-ER-172; 11-ER-2400.) That is not the law. *See McDonnell*, 579 U.S. at 572 ("[T]he public official need not specify the means that he will use to perform his end of the bargain."); *Silver II*, 948 F.3d at 553 (jury need not find that "the specific act to be performed was identified at the time of the promise"); *United States v. Ma*, 2021 WL 5860893, at *2 (9th Cir. Dec. 10, 2021) ("[A] quid pro quo arrangement giving rise to honest services fraud can be 'implicit' and need not 'concern a specific official act.'" (citation omitted)). All that is required is the intent to receive official acts on a specific *matter*, which

48

the jury instructions uniformly identified as the redevelopment of the LA Grand Hotel.

Instruction No. 35 also erroneously imported the higher *McCormick* standard applicable only to campaign-contribution cases: that the exchange be "clear and unambiguous, leaving no uncertainty about the terms of the bargain." (1-ER-171); *see United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992) (explaining that "what *McCormick* requires is that the quid pro quo be clear and unambiguous, leaving no uncertainty about the terms of the bargain"). This language is inapplicable here and at odds with *McDonnell*. 579 U.S. at 572 ("The agreement need not be explicit.").

### c. Defendant's instruction on ingratiation was duplicative of the substantive count instructions

The court did not have a duty to revise Instruction No. 35 and excise its many errors. *United States v. Oreto*, 37 F.3d 739, 749 (1st Cir. 1994) ("[T]he district judge is not required to edit a proposed instruction to delete the bad and preserve the good."); *Cherry v. Stedman*, 259 F.2d 774, 777-78 (8th Cir. 1958) (similar). Thus, this Court can affirm the court's refusal to issue Instruction No. 35 based on the above errors

alone. But if the Court reaches defendant's other argument that the instruction was necessary to address ingratiation, this too fails.

The instructions on each substantive count correctly reflected the strict quid-pro-quo intent and official-act requirements that the government voluntarily adopted. All three instructions made clear the requisite connection between defendant's intent and official action. *Sun-Diamond*, 526 U.S. at 405. They captured the "critical difference between bribery and generalized gifts," with the former requiring the offering of the benefit with an intent to influence an official act. *See Kemp*, 500 F.3d at 281 (instruction that "you must find that the giver had a specific intent to give something of value in exchange for an official act" "correctly described the law of bribery, and left no danger that the jury would convict upon merely finding that [defendants] provided benefits to [the public official] in a general attempt to curry favor or build goodwill." (cleaned up)).

All three substantive instructions had an additional safeguard to preclude a conviction based on lawful ingratiation: they identified the "specific and focused matter" (the redevelopment) towards which defendant's intent must have been directed. *McDonnell*, 579 U.S. at

50

574. By requiring the jury to find defendant provided benefits intending to influence official acts *favorable to the redevelopment*, the district court eliminated any risk of a conviction based on generalized gift-giving "by reason of the recipient's mere tenure in office." *Sun-Diamond*, 526 U.S. at 408.

A finding by the jury that defendant sought to influence official acts on a specific, focused, and concrete matter is squarely inconsistent with lobbying for *generalized* goodwill, which lacks a specific object for the benefits. The specific matter is what distinguishes a growers' trade association that represents 5,000 member cooperatives seeking to ingratiate itself generally to the Secretary of Agriculture "because of his position," *Sun-Diamond*, 526 U.S. at 403, from a developer who pays over a million dollars to influence a Councilmember to take official acts approving a 77-story redevelopment of his hotel that sits in that official's district. The latter is what this jury was required to find, and did find, in this case.

Even defendant acknowledges that the intent to give the benefit "specifically . . . in exchange for an official act" is what distinguishes unlawful from lawful intent. (AOB-30.) That intent requirement was

51

already captured in the court's substantive instructions. So the court had no need to provide duplicative language from Instruction No. 35, which was tainted by other misstatements of the law. *See Kaplan*, 836 F.3d at 1215; *Oreto*, 37 F.3d at 749.

### d. Defendant's ingratiation instruction lacked foundation, and any error was harmless.

Finally, there was no foundation to give defendant's ingratiation language because it did not pursue that defense at trial. Accordingly, even if the jury had been so instructed, it would have made no difference to the outcome. *See Kaplan*, 836 F.3d at 1215 ("Jury instructions, even if imperfect, are not a basis for overturning a conviction absent a showing that they prejudiced the defendant.")

Without any cites to the record, defendant claims the "fulcrum of SZNW's defense" was that "Chairman's gifts were attempts at ingratiation, at most; he was trying to build a reservoir of goodwill" with Huizar. (AOB-14, 28.) The actual record reveals otherwise. The defense flatly *denied* that Huizar's job as a councilman mattered to Huang and claimed that what did matter was a shared love of partying. (11-ER-2553, 2558.) The defense repeatedly claimed that Huang provided benefits to Huizar, including $600,000 in settlement money,

because Huizar was a friend and "brother." (*See* 6-ER-2558.) The defense also claimed that Huang, whose sole business in Huizar's district was the LA Grand Hotel, had no need to lobby Huizar given the redevelopment's universal popularity and because Huizar would not have been in office to see the project through. (*See* 2-ER-278; 10-ER-2527; 11-ER-2562.) Each of these trial defenses is inconsistent with the ingratiation theory defendant now espouses.

For similar reasons, even if the district court erred in omitting Instruction No. 35—and it did not—any error would be harmless because defendant failed to develop the ingratiation theory at trial and overwhelming evidence showed that Huang gave benefits intending to obtain official acts for the redevelopment. *See United States v. Lonich*, 23 F.4th 881, 901 (9th Cir. 2022) (any instructional error did not prejudice defendants where there was "overwhelming evidence that defendants had the required mens rea").

## C.  The Travel Act Convictions Should Be Affirmed

### 1.  *Procedural background*

The Travel Act counts were predicated on violations of California Penal Code sections 67.5, 85, and 165. (1-ER-53-55.) Before trial,

defendant moved to dismiss, arguing that the state bribery statutes were improper predicate offenses.  (CR-235.)  The district court denied the motion, concluding that the statutes comfortably fell within the conduct prohibited under the Travel Act.  (1-ER-216-35.)

On appeal, defendant again claims that a predicate state bribery statute must have quid-pro-quo and official-act requirements, and that because the California statutes lacked such requirements, they were improper predicate offenses under the Travel Act.

### 2.    *Standard of review*

Sufficiency of an indictment is subject to de novo review.  *United States v. Chi*, 936 F.3d 888, 893 (9th Cir. 2019).

### 3.    *A categorical approach does not apply*

Defendant's argument is based on a false premise: that a categorical approach applies to determine whether a defendant's violation of state law falls within the generic definition of bribery.  In fact, a conduct-based approach applies; it is enough that a defendant violates state law with conduct constituting generic bribery.

The Supreme Court has twice clarified that courts examine conduct under this provision of the Travel Act.  *See Perrin*, 444 U.S. at

50 (Travel Act "encompass[es] conduct in violation of state commercial bribery statutes"); *United States v. Nardello*, 393 U.S. 286, 295-96 (1969) (clarifying that inquiry is whether state "prohibits the extortionate activity charged" and concluding that "conduct for which [the defendants] were indicted" fell "within the generic term extortion"). That approach is consistent with the statutory language. Unlike other federal statutes that ask whether a predicate offense has a particular *element*, the Travel Act focuses on whether the defendant has engaged in unlawful "*activity*." 18 U.S.C. § 1952 (emphasis added); s*ee United States v. Rogers*, 389 F. Supp. 3d 774, 787-92 (C.D. Cal. 2019) (explaining that this language calls for conduct-based approach).

*United States v. Chi*, 936 F.3d 888 (9th Cir. 2019), is not to the contrary. The Court dealt with a different provision there—18 U.S.C. § 1956—and it affirmed a conviction because a foreign law mirrored the generic definition of bribery. *Id.* at 897-98. Of course, a categorical match, as in *Chi*, is sufficient to show that conduct fell within the generic definition. But it is not *necessary* under the statute.

55

As explained in Section V.A, defendant's *conduct* constituted generic bribery and violated California law. The Court need not go further to affirm.

### 4. *The government adopted a higher burden requiring the jury to find quid-pro-quo intent and an official act*

The Court may also affirm because the government voluntarily adopted a higher burden that embraced both quid-pro-quo intent and an official-act requirement that defendant protests are missing from the California statues. Even where a categorical approach applies, a court may "go beyond the mere fact of conviction in a narrow range of cases where a jury was actually required to find all the elements" of the generic offense. *Taylor v. United States*, 495 U.S. 575, 602 (1990). For example, if a state burglary statute covers entry of both an automobile or a building, but the charging document and jury instructions "show that the defendant was charged only with a burglary of a building, and that the jury necessarily had to find an entry of a building to convict," then the court should find a categorical match, even though generic burglary does not encompass entry into an automobile. *Id.*

Here, the jury was required to find that defendant "performed the charged act . . . in violation of [the California statutes]." (1-ER-53.)

56

Each charged act was that defendant "provided [benefits] in exchange for Jose Huizar agreeing to perform official acts to benefit the redevelopment of the LA Grand Hotel." (1-ER-53-54.) This instruction mirrored the language defendant requested: that Huang "agreed to pay [benefits] in exchange" for "Huizar agreeing to take official acts to benefit the LA Grand Hotel project." (SER-233.)

Because the jury was required to find quid-pro-quo intent for an official act to convict on the Travel Act, the Court should affirm.

### 5. The California bribery statutes are proper predicate offenses even under defendant's categorical approach

Even if the Court adopts defendant's premise, the California bribery statutes still qualify as predicate offenses under the Travel Act.

### a. The Travel Act broadly criminalizes state bribery and easily encompasses the California statutes

Under the Travel Act, it is a crime to travel in interstate or foreign commerce with intent to "promote, manage, establish, carry on, or facilitate…any unlawful activity." 18 U.S.C. § 1952(a)(3). "Unlawful activity" includes "bribery… in violation of the laws of the State in which committed." 18 U.S.C. § 1952(b). By incorporating state bribery laws, the Travel Act was intended to "aid state and local governments"

57

in stamping out crime and to "remedy a gap in the authority of federal investigatory agencies" by prohibiting activities of traditional state and local concern. *Perrin*, 444 U.S. at 41-42.

In *Perrin*, the defendant was charged with Travel Act offenses predicated on state commercial bribery, *i.e.*, bribery of *private* individuals. 444 U.S. at 39. The defendant urged the Supreme Court to adopt a narrow reading of "bribery" and hold that state commercial bribery could not be a predicate under the Travel Act. *Id*. at 41. Recognizing Congress' clear intent to construe the Travel Act broadly, the Court rejected defendant's "narrow interpretation of bribery" and held that the "ordinary, contemporary, common meaning" of bribery at the time the Travel Act was enacted in 1961 controlled. *Id*. at 42-43, 49. Despite the lack of an analogous federal commercial bribery statute, the Court held that—based on other federal and state laws in effect in 1961 and the Model Penal Code, prohibiting corrupt payments to private individuals—generic bribery encompassed commercial bribery, which does not involve public officials at all. *Id.*

Given *Perrin*'s broad construction of bribery under the Travel Act, the California statutes easily meet the meaning of bribery. Each

statute prohibits giving or offering a "bribe" to a public official. Cal. Penal Code §§ 67.5, 85, 165; (1-ER-53-55). A "bribe" is giving or promising something of value "with a corrupt intent to influence, unlawfully, the person to whom it is given, in his or her action, vote, or opinion, in any public or official capacity." Cal. Penal Code § 7(6) (emphasis added). Thus, the key elements of offering a bribe under California law are to (1) give or offer something of value (2) with the corrupt intent to influence the official (3) in an action, vote, or opinion in an official capacity. *People v. Gaio*, 97 Cal. Rptr. 2d 392, 398 (Ct. App. 2000).

The weight of authority reveals that California bribery matches the common and ordinary meaning of bribery in 1961. *See Chi*, 936 F.3d 897 (looking to Black's Law Dictionary and the Model Penal Code to determine the "ordinary, contemporary common meaning" of "bribery of a public official"). Black's Law Dictionary (4th ed. 1968) defines bribery as the "offering [or] giving… anything of value to influence actions as official or in discharge of legal or public duty." Similarly, Section 240.1 ("Bribery in Official and Political Matters") of the 1962 Proposed Draft Model Penal Code reads: "A person is guilty of bribery

59

. . . if he offers . . . any pecuniary benefit as consideration for the recipient's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant." Those definitions are consistent with the California statutes.

Although defendant claims that section 240.1 of the draft Model Penal Code defined bribery as offering the benefit as consideration "for an official act," section 240.1 says nothing about an "official act." In fact, section 240.1 defines the object of the bribe to include "opinion"— the same term that defendant argues renders the California statutes overly broad. (AOB-35-36.)

Defendant also takes issue with California's "intent to influence" language. Yet even 18 U.S.C. § 201, which defendant embraces, proscribes corruptly offering a thing of value "with intent to influence." Confusing matters further, defendant points to nine state court cases and claims that the "majority" of state bribery laws "required both a quid pro quo and an official act." (AOB-37.) But almost all those states use the same "intent to influence" and "opinion" language found in the California statutes and are devoid of any official act requirement. *E.g.*, Ariz. Rev. Stat. § 13-2602(A.1) (bribery is offering benefit "with the

intent to influence" the official's "opinion… or other action in his official capacity"); Del. Code tit. 11, § 1201 (offering benefit upon understanding that the official's "opinion… or exercise of discretion" "will thereby be influenced"); Haw. Rev. Stat. § 710-1040(1)(a) (offering benefit "with the intent to influence" the official's "opinion… or other action"); Minn. Stat. § 609.42(1) (offering benefit "with intent thereby to influence"); N.Y. Penal Law § 200.00 (offering benefit upon understanding the official's "opinion… or exercise of discretion" "will thereby be influenced"); Tenn. Code § 39-16-102 (offering benefit "with the intent to influence the public servant's vote, opinion"); Tex. Penal Code § 36.02 (offering benefit as consideration for the "opinion…or other exercise of discretion as a public servant").  These other states' laws prove the government's point—that bribery under California law easily meets the ordinary definition of bribery.

### b.    *Bribery under the Travel Act is not governed by 18 U.S.C. § 201*

The Travel Act's reference to "bribery" does not implicate 18 U.S.C. § 201 or an official act as defined by *McDonnell*.  In *Chi*, this Court rejected the claim that 18 U.S.C. § 201 controls the generic definition of "bribery of a public official" under 18 U.S.C. § 1956.   It

61

observed that the text contained "no such reference" to § 201, even as it cited *other* specific federal laws. *Chi*, 936 F.3d at 896.  It also observed that § 201 was "merely one strand of an intricate web of regulations" governing bribes and that the money laundering statute gave "no indication which—if any—federal law should define the meaning of 'bribery of a public official.'" *Id.* (citation omitted).  The Third Circuit has agreed. *See United States v. Ferriero*, 866 F.3d 107, 128 (3d Cir. 2017) (rejecting argument that § 201 governs bribery under RICO and Travel Act and declining to "transplant[] the conclusions in *McDonnell*" that are based on a particular federal statute).

The same reasoning applies to "bribery" under the Travel Act.  It too references specific federal laws, but § 201 is not one of them.  *See* 18 U.S.C. § 1952(b) (referencing business enterprises involving controlled substances defined in section 102(6) of the Controlled Substances Act and acts indictable under subchapter II of chapter 53 of Title 31 or under 18 U.S.C. §§ 1956, 1957).  Had Congress intended to criminalize "bribery" only where the state statute tracked the requirements of § 201, it would have said so.  *See Chi*, 936 F.3d at 896.  Indeed, it makes even less sense to force § 201's text-bound requirements onto the Travel

Act's reference to "bribery," which is broader than § 1956's reference to "bribery of a public official**.**"  Such a holding would also be contrary to *Perrin*'s conclusion that "bribery" under the Travel Act includes commercial bribery, which does not involve an official act or public officials *at all.*

## D. The District Court's Evidentiary Rulings Do Not Warrant Reversal

### 1. *Factual background*

Prior to trial, defendant moved to exclude evidence of "other schemes." (CR-649.)  The district court largely granted defendant's motion and precluded evidence of "specific examples of other developer conduct," including benefits as small as Katy Perry concert tickets from another developer.  (12-ER-2836.)  The court only narrowly permitted the government to introduce evidence of the "general framework of the pay-to-play-scheme" where that framework "equally applied" to defendant.  (12-ER-2834-35.)

Defendant also moved to exclude evidence of Huizar's money laundering activities.  (CR-667.)  The court largely denied the motion, concluding there was sufficient foundation that the cash Huizar laundered through his family members, occurring on the heels of the

63

Vegas trips, was largely from Huang. (12-ER-2843-48; *see also* SER-28-36.) The court reasoned that Huizar's money laundering activity was relevant even if Huang was not specifically aware of it because it tended to show there was an illegal bribery scheme involving defendant and Huizar and that Huizar understood he was in a corrupt relationship with Huang. (12-ER-2846.)

Consistent with these pretrial rulings, the government presented no evidence of other specific schemes, developers, projects, or benefits. None of the schemes described in defendant's brief was presented at trial. (*See* AOB-12 (citing pre-trial proceedings).) No witness testified about the scope or extent of the pay-to-play scheme or the number of its participants. Nor did any of Huizar's family members testify about "bribes from other developers." (*Compare* AOB-14, *with* 8-ER-1724-40; 9-ER-1967-78, 2001-09.)

The government elicited limited testimony from Esparza about the general framework of the pay-to-play scheme. He explained that a developer who provided benefits to Huizar would become a "Friend of the Office" and receive favorable treatment on its project; Huizar and the developer often used middlemen to facilitate communications; and it

64

was important to the scheme to maintain Huizar's political seat and conceal financial benefits.  (5-ER-987-92.)

Esparza then testified about *defendant's* bribery scheme, at times referencing back to the same features of the general framework. Esparza explained that Huang's benefits made him a Friend of the Office with full access to Huizar and his staff; Huang used Zheng as his middleman to interface with Huizar's middleman, Esparza; Huang saved Huizar's political seat, thereby maintaining his powerful position in CD-14; and Huang and Huizar both concealed Huang's financial benefits through various methods.

During the government's direct examination of Zheng, he testified that he was concerned about Huang giving casino chips to Huizar, a government official, and discussed this concern with two other individuals.  (8-ER-1778-80.)  On cross-examination, defense counsel elicited testimony that Zheng raised his concerns directly with Huang. (8-ER-1835.)  When counsel asked Zheng what Huang's reaction was, the court sustained the government's hearsay objection.  (8-ER-1835-37.)  Thereafter, defense counsel elicited (without objection) testimony

that even after Zheng raised these concerns, Huang continued to take Huizar to Vegas. (*Id.*)

## 2. *Standard of review*

This Court reviews a district court's evidentiary rulings for abuse of discretion. *United States v. Boulware*, 384 F.3d 794, 800–01 (9th Cir. 2004). Because "trial judges are better able to sense the dynamics of a trial," this Court must accord "broad discretion" to them "in balancing probative value against prejudice." *United States v. Espinoza-Baza*, 647 F.3d 1182, 1189 (9th Cir. 2011) (cleaned up). The Court may affirm an evidentiary ruling on any basis supported by the record, even if it differs from the district court's reasoning. *United States v. Alexander*, 48 F.3d 1477, 1487 (9th Cir. 1995).

Reversal based on evidentiary error is not required where the government establishes "a 'fair assurance' of harmlessness or, stated otherwise, unless it is more probable than not that the error did not materially affect the verdict." *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1099 (9th Cir. 2005) (en banc).

### 3. The district court did not err in admitting limited evidence of the general pay-to-play scheme

Esparza's testimony was relevant and admissible as direct evidence and under Rule 403 to prove defendant was part of an honest-services-fraud scheme that involved paying bribes to Huizar. *See Skilling v. United States*, 561 U.S. 358, 408-10 (2010); *United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013).

### a. Admissibility as direct evidence

Esparza's limited testimony regarding the general pay-to-play scheme was properly admitted as direct evidence of the predicate scheme supporting the honest-services fraud counts. Direct evidence is admissible to establish "the circumstances surrounding the crime with which the defendant has been charged" so that the jury can "make sense of the testimony in its proper context." *United States v. Ramirez-Jiminez*, 967 F.2d 1321, 1327 (9th Cir. 1992). This evidence can include acts involving victims of the scheme with whom defendant did not interact, since those acts are relevant to prove "the scheme itself" and defendant's intent. *United States v. Boone*, 628 F.3d 927, 935 (7th Cir. 2010).

67

Esparza's testimony fits into this category. Because Esparza explained the general contours of the pay-to-play scheme, the jury could make sense of his detailed testimony on how *this* defendant operated the scheme in the same manner, had the same understanding of its pay-to-play purpose, and shared in its goals: paying bribes for official acts, maintaining Huizar's CD-14 position, and concealing joint criminal conduct. At a minimum, evidence regarding the pay-to-play framework was inextricably intertwined with a "sufficient contextual or substantive connection" to defendant's scheme and was necessary "to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012-13 (9th Cir. 1995).

Moreover, this evidence was admissible under Rule 404(b). That rule permits evidence of a third party's actions where the evidence shows that party's motive, intent, plan, and knowledge to partake in a bribery scheme with defendant. *See United States v. McCourt*, 925 F.2d 1229, 1235 (9th Cir. 1991). Esparza's testimony was admissible for these purposes as to Huizar, the scheme's other participant.

68

Evidence of Huizar's activities to launder and conceal *Huang's money* (and by extension their shared bribery scheme) was also admissible as direct evidence. "[M]ail and wire fraud are treated like conspiracy in several respects" and "[s]imilar evidentiary rules apply." *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992). Just as "acts and statements of co-conspirators are admissible against other conspirators, so too are the statements and acts of co-participants in a scheme to defraud admissible against other participants." *Id.*

The steps that Huizar took to disguise Huang as the source of this cash are admissible as acts in furtherance of their scheme and are highly probative of the existence of the scheme and the co-schemers' state of mind. Making that evidence more relevant still was the fact that Huizar laundered cash from defendant to funnel payments back to the bank loan he obtained through Huang's collateral (another Huang bribe), which the defense insisted was a legitimate loan and not a gift. (2-ER-277.)

Defendant's belated objection to Mrs. Huizar's testimony describing Huizar as "a terrible person" also misses the mark. (AOB-42.) That testimony, which was largely unobjected to at trial,

69

illustrated how Huizar prioritized Huang to be at his beck and call over his family and other obligations; it also rebutted the defense's claim that the Vegas trips were innocent family-friendly outings. (*See* 2-ER-275; 6-ER-1235-36.)

### b.  Rule 403

None of this evidence was unduly prejudicial under Rule 403, whose "major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000).  Evidence of the pay-to-play framework and Huizar's laundering of Huang's cash was highly probative to explain to the jury the existence of the charged scheme and how it worked.  Defendant's main objection is to the admission of *other* schemes, *other* developers, and *other* matters, but there was no such evidence at trial.  Defendant does not point to a single other developer, project, or bribe that was named during the 10-day trial.  And Esparza's explanation of the general framework took but seven minutes of his two-day stint on the stand, which was devoted to *this* defendant's bribes, concealment

efforts, plans for redevelopment, and corrupt relationship with Huizar. (*See* 5-ER-986-92.)

The May 2017 call in which Esparza referenced "tranzas" merely acknowledged the existence of the general pay-to-play scheme. (6-ER-1369-70.) Moreover, the government played that call on redirect only after defense counsel opened the door on cross-examination by suggesting Huang supported Esparza's enhanced title for altruistic reasons. (6-ER-1333-34.) The call, during which Esparza told another staffer that the enhanced title would help get the FBI off his tail, rebutted this point. (SER-23-25.)

The district court did not abuse its broad discretion to admit this highly probative evidence that went to the existence of the scheme and surrounding circumstances of the crime, aided the jury in making sense of Esparza's testimony, traced the cash bribes Huang paid to Huizar, and was limited to minimize undue prejudice.

### 4. The district court did not err in sustaining the objection to Huang's hearsay statement

The district court properly sustained the government's hearsay objection during Zheng's testimony. Defendant admits that it sought to elicit Huang's out-of-court statements to Zheng that "they [Huang and

71

Huizar] were just having fun" and "not doing anything wrong" and that Huang had not asked Huizar for anything. (AOB-46 (citing 12-ER-2658-59).) Defendant sought to admit Huang's assertions denying he was part of any exchange, thereby presenting self-serving evidence of Huang's stated belief without subjecting him to cross-examination. A defendant cannot avoid testifying by introducing his own hearsay statements. *United States v. Mitchell*, 502 F.3d 931, 964-65 (9th Cir. 2007) (affirming court ruling precluding defense counsel from eliciting defendant's exculpatory statements); *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988).

The then-existing mental, emotional, or physical condition exception does not apply here. That exception encompasses "statement[s] of the declarant's then-existing state of mind (such as motive, intent, or plan)" but *not* statements of belief "to prove the fact remembered or believed[.]" Fed. R. Evid. 803(3). The exception does not permit "the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind"; instead, it "narrowly limit[s] those admissible statements to declarations of

72

condition—'I'm scared'—and not belief—'I'm scared because [someone] threatened me." *United States v. Fontenot*, 14 F.3d 1364, 1371 (9th Cir. 1994) (cleaned up).

The statements defendant sought from Zheng fall squarely in the carve-out of statements not made admissible by Rule 803(3). They are Huang's statements of belief (*i.e.*, I'm not concerned) and the claimed reasons for that belief (*i.e.*, because we are just having fun and I have not asked Huizar for anything).

On appeal, defendant invokes for the first time the rule of completeness as another basis for admitting Huang's statements; thus, the ruling can be reversed on this ground only for plain error. *See United States v. Rusnak*, 981 F.3d 697, 707 (9th Cir. 2020) ("When a defendant does not object to the introduction of evidence at trial on the same grounds as raised on appeal, the district court will only be reversed for plain error."). The rule of completeness, set forth in Federal Rule of Evidence 106, permits admission of an additional part of a "writing or recorded statement" when the other party introduced a misleadingly tailored snippet of that statement out of context. Fed. R.

Evid. 106; *United States v. Liera-Morales*, 759 F.3d 1105, 1111 (9th Cir. 2014).

Huang's statements were not admissible under the rule of completeness. *First*, consistent with the text of Rule 106, this circuit has applied the rule of completeness only to written and recorded statements. *United States v. Hayat*, 710 F.3d 875, 896 (9th Cir. 2013). *Second*, even if the principle underlying Rule 106 extended to unrecorded statements like Huang's, the rule "does not compel admission of otherwise inadmissible hearsay evidence." *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996). As explained, Huang's out-of-court statements constitute hearsay without an exception. And *third*, there was no misleading impression created by the government's introduction of Huang's partial statement that the complete statement would serve to correct. *See United States v. Vallejos*, 742 F.3d 902, 905 (9th Cir. 2014). The government did not introduce Huang's statements on this point at all or that Zheng raised his concerns with Huang—that was defendant's doing. The rule of completeness has no applicability under these circumstances. *See United States v. Dorrell*, 758 F.2d 427, 434-35 (9th Cir. 1985) (no rule of completeness violation where the

edited version of a confession did not "distort[] the meaning of the statement").

### 5. Any error was harmless.

Any error was harmless, given the minimal scope of the challenged evidence and the overwhelming evidence that defendant participated in a bribery scheme with the requisite corrupt intent. Even setting aside evidence of the pay-to-play framework and Huizar's money laundering, there was substantial evidence that Huang intended to receive official acts from Huizar through his bribes, including Huang's and Huizar's statements and conduct, Huang's pattern of giving benefits and making requests of Huizar in his official capacity, Huang's and Huizar's efforts to conceal their scheme, and the acts that Huizar performed for Huang.

Similarly, the exclusion of Huang's hearsay statement did not matter because defendant made the point he sought to establish: that Huang did not believe he was doing anything wrong with Huizar. Defendant did this through Zheng's testimony that Huang was just having fun with Huizar as friends, that he continued to take Huizar to Vegas even after Zheng raised his concerns, and that Huang continued

with his project even after learning of the FBI investigation. (*E.g.*, 8-ER-1837-38, 1849-50.) Defendant fully presented this point as part of his overall lack-of-intent argument to the jury. (11-ER-2558.)

There is more than a "fair assurance" that different evidentiary rulings would not have changed the trial's outcome. Reversal is not warranted.

# VI

# CONCLUSION

Defendant's convictions should be affirmed.

DATED: January 17, 2024        Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

BRAM M. ALDEN
Assistant United States Attorney
Chief, Criminal Appeals Section

*/s/ Susan Har*

SUSAN HAR
Assistant United States Attorney
Public Corruption and Civil Rights
Section

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

## STATEMENT OF RELATED CASES

The government states, pursuant to Ninth Circuit Rule 28-2.6, that it is aware of two cases related to this appeal: *United States v. David Lee,* No. 23-1687, and *United States v. 940 Hill, LLC*, No. 23-1688, which arise out the same indictment and case in the district court (No. CR 20-00326-JFW).

## CERTIFICATE OF COMPLIANCE

I certify that:

1.      This brief complies with the length limits permitted by

Ninth Circuit Rule 32-1 because the brief contains 13,908 words,

including words manually counted in any visual images and excluding

the portions exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P.

32(a)(6) because it has been prepared in a proportionally spaced

typeface (14-point Century Schoolbook) using Microsoft Word 2016.

DATED: January 17, 2024          */s/ Susan Har*

SUSAN HAR
Attorney for Plaintiff-Appellee
UNITED STATES OF AMERICA